**Fouad Yacoub RAFEEDIE**

v.

**IMMIGRATION & NATURALIZATION SERVICE, an Agency of the Federal Government, et al., Appellants.**

**Fouad Yacoub RAFEEDIE, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, et al.**

Nos. 88–5240, 88–5267.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 31, 1988.

Decided July 21, 1989.

Steven R. Valentine, Deputy Asst. Atty. Gen., Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., and Douglas Letter, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellants in No. 88–5240 and appellees in No. 88–5267.

David Cole, with whom Timothy B. Dyk, Kerry W. Kircher and Michael Maggio, Washington, D.C., were on the brief, for appellee in No. 88–5240 and cross-appellant in No. 88–5267.

Arthur B. Spitzer and Elizabeth Symonds, Washington, D.C., were on the brief for amici curiae, urging reversal.

Before RUTH B. GINSBURG, SILBERMAN and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

Concurring opinion filed by Circuit Judge RUTH B. GINSBURG.

Dissenting opinion filed by Circuit Judge SILBERMAN.

D.H. GINSBURG, Circuit Judge:

Defendants Immigration and Naturalization Service and several governmental officers sued in their official capacities (treated collectively here) appeal from an order of the district court insofar as it granted a preliminary injunction prohibiting the INS from conducting exclusion proceedings against plaintiff Fouad Yacoub Rafeedie. Rafeedie cross-appeals the order to the extent that it denied his motion for partial summary judgment on his substantive challenge to the exclusion proceedings.

The Government's interlocutory appeal is as of right pursuant to 28 U.S.C. § 1292(a)(1). The district court certified, and we allowed, Rafeedie's cross-appeal pursuant to 28 U.S.C. § 1292(b).

### I. STATUTORY SCHEME

On entry (or reentry) into the United States, "[e]very alien ... who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land" is detained for further inquiry. 8 U.S.C. § 1225(b). Should the INS believe it to be in the public interest to do so, however, it may "parole" the alien into the United States pending the outcome of that inquiry. 8 U.S.C. § 1182(d)(5)(A). If, upon investigation, the INS determines that the alien is excludable, it initiates exclusion proceedings against him. Such proceedings may take one of two forms: plenary proceedings under § 236 of the Immigration and Nationality Act, 8 U.S.C. § 1226, or summary proceedings under § 235(c), 8 U.S.C. § 1225(c).

Plenary exclusion proceedings under § 236 are conducted before an Immigration Judge (IJ), who is an officer of the Justice Department but independent of the INS. 8 C.F.R. Part 3. The alien has the right to be represented by counsel and must be so

**508**

apprised. 8 C.F.R. § 236.2(a). The proceedings are on the record, and the alien has the right to have them open to the public and the press. *Id.* He has the opportunity to present evidence and to cross-examine witnesses. 8 U.S.C. § 1226; 8 C.F.R. § 236.2(a). If the alien is a permanent resident (like Rafeedie), then the burden is on the INS to establish his excludability. *Kwong Hai Chew v. Rogers*, 257 F.2d 606 (D.C.Cir.1958). Finally, any decision to exclude the alien is appealable to the Board of Immigration Appeals, 8 C.F.R. §§ 236.7, 3.36(a), 3.1(b)(1).

Summary proceedings under § 235(c) may be used only against an alien who appears to be excludable under certain enumerated sections of the Act, including the following two provisions invoked against Rafeedie:

(27) Aliens who the consular officer or the Attorney General knows or has reason to believe seek to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States.

(28) ... (F) Aliens who advocate or teach or who are members of or affiliated with any organization that advocates or teaches ... (ii) the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers (either of specific individuals or of officers generally) of the Government of the United States or of any other organized government, because of his or their official character; or (iii) the unlawful damage, injury, or destruction of property; or (iv) sabotage....

8 U.S.C. §§ 1182(a)(27), (28)(F). In such a case, the examining immigration officer at the port of arrival, "if possible, take[s] a brief sworn question-and-answer statement from the alien," advises the alien of his "right to make written representations," temporarily excludes the alien, and reports the case to the appropriate INS District Director. 8 C.F.R. § 235.8(a). The District Director then forwards the case to the Regional Commissioner, who considers it "together with such written statement and accompanying information, if any, as the alien or his representative may desire to submit...." 8 U.S.C. § 1225(c). The alien is not entitled to a hearing, or to confront the evidence against him.

If the information supporting the exclusion is "of a confidential nature the disclosure of which would be prejudicial to the public interest, safety, or security," it need not be disclosed to the alien, *id.* at 235.8(b), and the Regional Commissioner may summarily exclude him and order him deported. If the decision of the Regional Commissioner contains confidential information, then no more than "a separate order showing only the ultimate disposition of [the alien's] case" need be served upon him. 8 C.F.R. § 235.8(c). There is no appeal. *Id.*

## II. FACTS

Rafeedie was born in Jordan in 1957 and came to the United States in 1975 on an immigrant visa. He has been a lawful permanent resident alien for the fourteen years since arriving here. He currently lives in Ohio with his wife and child, both of whom are United States citizens, and has 34 other relatives, including his mother, living in the United States. Rafeedie was educated in the United States and has a job here. He has been politically active while living in this country, being particularly outspoken—in articles and on radio and television—in his opposition to American policies with respect to the Middle East. In 1981 or 1982, Rafeedie applied to become a naturalized citizen, but his petition for naturalization has yet to be finally adjudicated. He alleges that the INS has been dilatory in processing his application.

On April 7, 1986, Rafeedie applied for and obtained a reentry permit from the INS so that he could take a trip abroad. He stated on his application for the permit that he wished to go to Cyprus to be with his mother while she underwent "major heart surgery"; three days later, he obtained a visa to travel to Syria. In truth, Rafeedie's mother lives in Youngstown, Ohio.

The INS claims that Rafeedie went to Syria with Tarak Mustafa and Sulieman Shihadeh and that, while there, the three men attended the First Conference of the Palestine Youth Organization (PYO). The INS further claims that the PYO is affiliated with the Popular Front for the Liberation of Palestine (PFLP), and that the PFLP is a terrorist organization and a "constituent group" of the Palestine Liberation Organization (PLO). Rafeedie categorically denies that he has ever been "a member of or in any way affiliated with" the PLO, the PFLP, or any other organization "that engages in or supports terrorism," and states that he has never engaged in any terrorist activity.

When Rafeedie, Mustafa, and Shihadeh arrived in New York from Syria, they were questioned by INS and FBI officers. When their inspection at the airport was completed, Rafeedie was paroled for deferred inspection, and he returned to his home in Ohio. During the deferred inspection, Rafeedie said that he had not gone to Cyprus after all because his sister had called to tell him his mother's surgery had been cancelled. The INS asked (on three separate occasions) for information to corroborate that claim; Rafeedie did not respond.

In the spring of 1987, the INS charged Rafeedie with being excludable from the United States, pursuant to §§ 212(a)(27) and (28)(F) of the Act, 8 U.S.C. §§ 1182(a)(27), (28)(F).* His case was then referred to an IJ for a plenary hearing under § 236.

In December 1987, the IJ granted Rafeedie's request for an order requiring the INS to give him specific notice of the basis for the charges against him and to tell him whether the INS was subjecting him to electronic surveillance. One business day before it would have had to comply with the IJ's order, however, the INS informed Rafeedie that, at some time after charging him with being excludable under §§ (27) and (28)(F), it had received confidential in-

formation supporting some of those charges. The Service thus temporarily excluded him pursuant to §§ (27) and (28)(F) and instituted summary exclusion proceedings under § 235(c). The INS served Rafeedie with "specific factual allegations of excludability," but it gave him no indication of the nature of the confidential information upon which it relied to use summary proceedings. On the Government's motion, the IJ closed the § 236 exclusion proceeding pending before him and excused the Service from complying with his earlier order.

Rafeedie then filed suit in the district court claiming that § 235(c) may not be applied to him. Of his various grounds in support of that claim, the two relevant to this appeal are (1) that § 235(c) may not, by its terms, be applied to a permanent resident alien; and (2) that, if it can be applied to a permanent resident, then § 235(c) violates the Due Process Clause of the Fifth Amendment. Simultaneous with filing his complaint, Rafeedie moved for (1) a preliminary injunction against the conduct of § 235(c) proceedings against him and against the conduct of any exclusion proceedings against him based on §§ 212(a)(27) or (28)(F); and (2) partial summary judgment on, *inter alia*, the statutory and constitutional claims set out above.

The INS moved to dismiss the action for lack of subject matter jurisdiction. The district court denied the Government's motion to dismiss, denied plaintiff's motion for partial summary judgment, and granted plaintiff's motion for a preliminary injunction. 688 F.Supp. 729. The Government appealed the grant of the preliminary injunction, Rafeedie cross-appealed the denial of his motion for partial summary judgment, and we consolidated the two matters.

We now affirm in part and reverse in part both the district court's grant of the preliminary injunction and its denial of Rafeedie's motion for partial summary judg-

---

* Rafeedie was initially charged also with being excludable under 8 U.S.C. § 1182(a)(29), but the INS later abandoned that claim. See Form I- 147, Notice of Temporary Exclusion, Attachment at 7–8.

ment, and remand the case to the district court for further proceedings.

### III. JURISDICTION

Since the Government argues that the district court was without jurisdiction to consider any of Rafeedie's claims, it is to that issue that we first direct our attention.

#### A. Judicial Review of Exclusion Orders

■ The statutory scheme for the review of exclusion proceedings is a complex one, involving both the general judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*, and the more specific terms of § 106 of the INA, 8 U.S. C. § 1105a. The latter statute provides that "any alien against whom a final order of exclusion has been made heretofore or hereafter under the provisions of [§ 236] ... may obtain judicial review of such order by habeas corpus proceedings and not otherwise." 8 U.S.C. § 1105a(b). The statute further limits review of such exclusion orders by providing that "[a]n order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right...." 8 U.S.C. § 1105a(c).

Section 106 cannot be understood, however, apart from the context provided by the review provisions of the APA. Section 702 of that statute provides that "[a] person suffering legal wrong because of agency action ... is entitled to judicial review thereof." 5 U.S.C. § 702. Section 703 provides in turn that

> [t]he form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction.

5 U.S.C. § 703. Finally, § 559 specifies that a "[s]ubsequent statute may not be held to supersede or modify [*inter alia,* the above-quoted sections] except to the extent that it does so expressly." 5 U.S.C. § 559. Thus, absent a "special statutory review proceeding" applicable to a particular agency action (or an express statutory bar to judicial review), if the other jurisdictional requisites are satisfied, an aggrieved party may challenge the action in a suit brought in federal district court.

As is apparent from the terms of the APA, agency action is presumptively subject to judicial review thereunder. *Japan Whaling Association v. American Cetacean Society,* 478 U.S. 221, 231 n. 4, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1986) ("A separate indication of congressional intent to make agency action reviewable under the APA is not necessary; instead, the rule is that the cause of action for review of such action is available absent some clear and convincing evidence of legislative intention to preclude review."); *see also Block v. Community Nutrition Institute,* 467 U.S. 340, 351, 104 S.Ct. 2450, 2456, 81 L.Ed.2d 270 (1984) ("[T]he [clear and convincing evidence] standard [would be] met, and the presumption favoring judicial review overcome, whenever the congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme.'") (*quoting Data Processing Service v. Camp,* 397 U.S. 150, 157, 90 S.Ct. 827, 832, 25 L.Ed.2d 184 (1970)). Indeed, in *Rusk v. Cort,* 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962), the Supreme Court applied this teaching specifically to the INA. The issue there was whether the provision stating that a final administrative decision respecting a citizenship claimant who is "not within the United States" would be subject to judicial review "in habeas corpus proceedings and not otherwise," 8 U.S.C. § 1503(b), (c), precluded review under the APA. In the factual situation presented there, the more precise question was "whether, despite the liberal provisions of the [APA], Congress intended that a native of this country living abroad must travel thousands of miles, be arrested, and go to jail in order to attack an administrative finding that he is not a citizen of the United States." 369 U.S. at 375, 82 S.Ct. at 792. The Court was "satisfied that Congress did

not intend to foreclose lawsuits by claimants, such as Cort, who do not try to gain entry to the United States *before* prevailing in their claims to citizenship." *Id.* at 379, 82 S.Ct. at 794 (emphasis in original). Moreover, the Court noted, previous decisions taught that "the Court will not hold that the broadly remedial provisions of the [APA] are unavailable to review agency decisions under the [INA] in the absence of clear and convincing evidence that Congress so intended." *Id.* at 379–80, 82 S.Ct. at 794.

It is against this background that we must analyze the finality and habeas corpus provisions of § 106. In adopting that section, Congress did say that it was "implement[ing] and apply[ing]" § 703 of the APA by "creat[ing] a single, separate, statutory form of judicial review of administrative orders for the deportation and exclusion of aliens...." H.R.Rep. No. 1086, 87th Cong. at 22 (1961), *reprinted in* 1961 U.S.Code Cong. & Admin.News 2950, 2966. The first question we must resolve, therefore, is whether there is, in the words of *Cort,* 369 U.S. at 380, 82 S.Ct. at 794, "clear and convincing evidence that Congress ... intended" § 106(c) to apply even to an alien in Rafeedie's unusual position.

We need not express a view on the question whether § 106(c), where it applies, functions, without exception, as a bar to judicial review at the instance of an alien who does not comply with its terms. *Compare* Concurrence *infra,* at 526–29 *and Ramirez–Osorio v. INS,* 745 F.2d 937, 939 (5th Cir.1984) (court may excuse failure to comply with § 106(c) in appropriate circumstances) *with* Dissent at 532–34 *and Garcia–Mir v. Smith,* 766 F.2d 1478, 1489 (11th Cir.1985) (§ 106(c) operates as absolute jurisdictional bar) (alternative holding). Even if § 106(c) does operate as an absolute barrier in cases within its compass, however, that section, we conclude, does not cover this case. This case differs from the paradigmatic circumstances to which § 106(c) applies in two particulars: first, the proceeding pending against Rafeedie, which he seeks to enjoin, is a summary § 235(c) proceeding rather than a plenary § 236 proceeding; second, Rafeedie is a permanent resident alien rather than an initial entrant into the United States. For reasons we will explore momentarily, the statute and its legislative history leave us doubtful that Congress intended that § 106(c) ever apply to exclusion proceedings under § 235(c), and confident that even if Congress did intend that, it did not envision that the statute would apply to the extraordinary case of an attempt summarily to exclude a permanent resident alien.

Rafeedie points out that § 106(b) and (derivatively) § 106(c) are limited by the terms of the former to "order[s] of exclusion ... made ... under the provisions of [§ 236]...." 8 U.S.C. § 1105a(b). The exclusion order entered here was made under the provisions not of § 236 but of § 235(c). The strong inference from the text of § 106(b)—that it does not apply to summary exclusion orders—is bolstered by its legislative history, which indicates that Congress indeed intended to refer only to orders of exclusion made under § 236 when it used those words. It understood that

> [a]n order of exclusion is made in the case of an arriving alien following inspection by immigration officers ... and an examination or inquiry in the nature of an administrative hearing conducted by a special inquiry officer.... From an order of exclusion the law permits an appeal to the Attorney General.

H.R.Rep. No. 1086 at 30, U.S.Code Cong. & Admin.News 1961, p. 2974. Because there is neither a hearing before a special inquiry officer nor the possibility of appeal to the Attorney General in a § 235(c) summary proceeding, as there is in a § 236 proceeding, this bit of legislative history strongly suggests that Congress intended that §§ 106(b) and (c) apply only to exclusion orders entered under § 236. To extend § 106(c) to a § 235(c) proceeding is to push it out beyond the point where Congress's premise supports it.

The INS responds that if § 106(c) is not interpreted to apply to summary proceedings, then the "compelling national security interests" that underlie § 235(c) "imply that Congress intended to provide *no* review rather than *unlimited* review" of

summary proceedings. Viewed in isolation, this suggestion is not without considerable force; but it cannot be viewed in isolation. Seen in the light of the clear statement required from Congress if APA review of agency action is to be foreclosed, the Service's argument is quite clearly wrong. If § 106(c) does not apply to summary proceedings, then the only sensible conclusion is that the generally applicable law of reviewability—that is to say, the APA—applies and provides for judicial review of such proceedings.

The Government's related alternative argument, which is far more persuasive, begins with the observation that the clear import of § 106 is to limit the judicial review available to aliens. That much is clear from its face; it provides strict limits on the ability of any alien under its coverage to obtain the aid of the courts. The INS then argues that because the only aliens subject to § 235(c) are those who are accused of being terrorists or other people whom Congress clearly considers to be especially undesirable, it would be incongruous for Congress to permit these people greater access to judicial review than it affords to other aliens excluded for less compelling reasons.

This is a strong argument from anomaly, and were we faced with a case in which the only question was whether § 106(c) applies to proceedings brought under § 235(c), we might be persuaded, as is our colleague in dissent, to overcome the apparently plain language of the statute, and its equally clear legislative history, on the theory that Congress could not have intended to do what it appears to have done and to have said it was doing. This case, however, presents an added wrinkle that would render the application of § 106(c) to this action even more anomalous than its non-application—Rafeedie is a permanent resident alien.

We have found no evidence that Congress so much as considered the possibility that the INS would use summary exclusion proceedings against a permanent resident alien. Nor have we found anything to suggest that either the Eisenhower or the Kennedy Administration, each of which backed the adoption of § 106, see H.R.Rep. No. 1086 at 24–25 (Kennedy) and 25–26 (Eisenhower), even hinted that § 235(c) would be available against a permanent resident alien. Furthermore, the constitutional validity of such an application of § 235(c) had already been thrown into serious doubt by the Supreme Court in *Kwong Hai Chew v. Colding (Chew)*, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953), and *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). Indeed, in the only reported case in which the INS thereafter sought to test the point, § 235(c) was held unconstitutional as applied to a permanent resident. *United States ex rel. Kasel de Pagliera v. Savoretti*, 139 F.Supp. 143 (S.D.Fla.1956). As usual, we presume that Congress was aware of these coordinate branch developments, and we doubt that it would have taken a contrary position on the constitutional issue without mentioning that it was doing so. Finally, it is sensible, and not at all anomalous, for Congress to have allowed a permanent resident whom the INS seeks to exclude without the most basic procedural safeguards readier access to judicial review than is available either to an initial entrant, who is not, in any sense, a stakeholder in America, or to another permanent resident who will be afforded the procedural protections of a plenary exclusion proceeding. Thus, we think it reasonably clear that Congress did not intend § 106(c) to bar judicial review of an attempt summarily to exclude a permanent resident.

Indeed, there is a reasonable question, which we do not resolve here, whether Congress intended §§ 106(b) and (c) to apply at all to permanent residents, even those excluded pursuant to § 236. In explaining its decision to limit judicial review of exclusion proceedings to *habeas corpus*, the House Committee stated:

Such a restriction to habeas corpus does not deprive the alien of any constitutional rights. It is well settled that aliens seeking admission to the United States cannot demand that their application for entry be determined in a particular manner or by use of a particular type of

proceedings. *For those aliens, the procedure fixed by Congress is deemed to be due process of law. (Knauff v. Shaughnessy, 338 U.S. 537 [70 S.Ct. 309, 94 L.Ed. 317] (1950)).* H.R.Rep. No. 1082 at 32, U.S.Code Cong. & Admin.News 1961, p. 2976 (emphasis added). Congress thus clearly envisioned that the procedures outlined in §§ 106(b) and (c) would be applied to "aliens seeking admission to the United States," who have no constitutional rights to any prescribed process. Initial entrants, not returning permanent resident aliens, fit this description. But the legislative history is admittedly skimpy, and we need not take its precise measure to resolve this case.

As we have said (*supra,* at 510–11), limitations on judicial review of agency action under the APA are not lightly to be inferred, but are to be found only where Congress sends a clear message that it intends to adopt such limits. It seems relatively clear that Congress did not intend for § 106(c) to bar judicial review of summary exclusion proceedings; there is even some question whether Congress intended it to apply to permanent residents at all. More narrowly, we cannot find clear and convincing evidence that Congress intended that § 106(c) operate to foreclose judicial review under the APA where, as here, both circumstances obtain, in that a permanent resident alien challenges the INS's initiation of summary exclusion proceedings against him.

We pause briefly to emphasize what we do not hold—that § 106 is entirely inapplicable to permanent residents. Our dissenting colleague makes several persuasive arguments that such a holding would be troublesome for both procedural and substantive reasons. Dissent *infra,* at 535–42. But our discussion is relevant to the reach of § 106 only insofar as that statute deals with judicial review of *exclusion* proceedings, and our holding is concerned only with a species of those—*viz.,* summary exclusion proceedings directed at permanent resident aliens; there is no such animal as a "summary deportation," and we have no occasion in this case to concern ourselves with the application *vel non* of §§ 106(a) and (c)

to an attempt to deport a permanent resident. Our holding is quite limited in scope and, contrary to the dissent, is one for which Rafeedie argued. *See, e.g.,* Brief of Appellee at 6–8.

## B. The Exhaustion Requirement

■ The foregoing does not end our examination of the Government's contention that we are without jurisdiction to hear this case, however; though § 106 does not bar this action, we must still consider whether Rafeedie's failure to exhaust his administrative remedies does. While Congress did not manifest an intent to apply the particular (and quite strict) exhaustion requirement of § 106(c) to cases such as this, neither did it indicate that it was opting out of the prudential exhaustion requirement that the courts routinely apply to putative challengers of agency action.

Our analysis of whether exhaustion is required in a particular APA case turns upon the extent to which strict adherence to the requirement will serve the general purposes of the doctrine, *see, e.g., Atlantic Richfield Co. v. U.S. Department of Energy,* 769 F.2d 771, 781, 782 (D.C.Cir.1984), balanced against the extent of any injury that enforcement of the requirement will cause to the plaintiff, *see, e.g., Andrade v. Lauer,* 729 F.2d 1475, 1489–90 (D.C.Cir. 1984).

### 1. *The Purposes of the Exhaustion Requirement*

The now-familiar purposes served by the exhaustion requirement are catalogued by the Supreme Court in, *e.g., Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975), and *McKart v. United States,* 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969); and by this court in, *e.g., Andrade,* 729 F.2d at 1484. The first such purpose is to further Congress's intent to delegate to its agent the interpretation of a particular statute by prohibiting premature judicial interference with the agency's interpretive process. As the INS admits, however, it is without the authority to examine Rafeed-

ie's constitutional claim. Yet this case turns ultimately not on whether the INS has erred in interpreting § 235(c), but on Rafeedie's constitutional due process claim (*see infra*, at 519). By our decision today, we do not impose upon the INS our views of the correct reading of § 235(c); rather, we question the constitutionality of the INS's interpretation. Hence the first purpose of the exhaustion requirement is not implicated here at all.

The INS suggests, however, that Rafeedie's constitutional claim and the INS's interpretation of § 235(c) are inextricably intertwined—that is, that this court cannot decide whether Rafeedie's due process claims are valid until it knows what process, above the statutory minimum described earlier, the INS interprets § 235(c) to afford him in view of the unusual nature of this case—and that we should therefore delay our review to permit that process to take its course. The Service seeks support for this proposition in *Hastings v. Judicial Conference of the United States,* 770 F.2d 1093 (D.C.Cir.1985) (*Hastings I*), and *Hastings v. Judicial Conference of the United States,* 829 F.2d 91 (D.C.Cir.1987) (*Hastings II*).

In *Hastings I*, we held that a facial due process challenge to a statute providing for discipline of federal judges was not ripe for judicial review. The court declined to intervene before the relevant procedural rules had been interpreted by the body authorized to apply them, because, so far as the court could then determine, "anything might happen in the proceedings initiated against appellant." 770 F.2d at 1100. Nor had the plaintiff federal judge shown that any injury would be caused by delaying judicial review. *Id.* at 1102. In *Hastings II*, the same plaintiff renewed his facial due process challenge after the statute had been applied to him. Ripeness was no longer a bar to judicial review, but we determined that renewal of the facial challenge was untenable after the statute had in fact been narrowly interpreted so as to avoid plaintiff's constitutional claims. Where the statute has been applied and the process claimed been given, we held, only a challenge to the statute as applied can be pursued. 829 F.2d at 105.

The lesson of the *Hastings* cycle is that the purposes of the exhaustion and ripeness requirements are implicated where there is genuine doubt as to what is going to happen in the administrative process. If there is a realistic possibility that the Government will grant as much process as a reviewing court might interpret the relevant statute to require, a pre-enforcement challenge will generally be inappropriate. Here, however, there is no doubt about the INS's interpretation of the statute. The statute is explicit in stating what process it requires, and the INS has repeatedly argued that Rafeedie has no due process right at all, so that the statutory minimum process is, *ipso facto*, constitutionally adequate.

The INS seeks to bring itself within *Hastings I* merely by asserting that it might yet decide to give Rafeedie more process than the statute can fairly be read to require. It points out that it has provided Rafeedie with notice of some of the specific charges against him, which it was not expressly required by § 235(c) to do. That notice, however, concerned not the basis on which the § 235(c) proceeding was initiated (the confidential information), but rather allegations of which he had already been made aware in the course of the § 236 proceeding previously initiated against him. The only indication he has of the nature of the confidential information that led the INS to institute the § 235(c) proceeding was provided in the course of this litigation. *See* Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment, Exhibit 2 at 21 (March 11, 1988) ("[The] confidential information discloses that Rafeedie is a high ranking member of the PFLP, in the United States. He has been active in both fund raising and recruiting activities for the PFLP. He fought with the PFLP in Lebanon in 1982, and claimed to have been wounded in combat.").

Although it did not raise the possibility before the district court, the Service now says that it might change its mind about

granting Rafeedie additional procedural safeguards. It thus urges the court to require Rafeedie to exhaust the Service's process, but still it is not willing actually to commit itself to any more than the minimum statutory summary proceeding. Raising the prospect, at this late date, that it may, in the uncertain future, decide to increase somewhat the process to be granted, is too little, too late to change the course of this litigation. In any event, if the agency had wanted to afford Rafeedie additional procedural safeguards, it could have stayed with § 236, or after it invoked § 235(c), committed itself to some level of process intermediate between the summary and the plenary.

We therefore conclude that early judicial review of Rafeedie's constitutional claim will not unduly interfere with the agency's delegated authority to interpret the statute it administers.

Little more need be said about the second and third bases for the exhaustion requirement—to give the agency the opportunity to correct its mistakes before the judiciary does so for it, and to give the reviewing court the benefit of the practical expertise that the agency brings to the interpretive enterprise. The only mistake that we suggest the INS may have made in this case is one of constitutional dimensions: its interpretation of § 235(c) may deny Rafeedie due process of law. The Service must apply the statute as it believes Congress intended, and it has made clear what it believes Congress to have wanted. If its interpretation is unconstitutional, only a court can so declare. *See Meredith Corp. v. FCC*, 809 F.2d 863, 872 (D.C.Cir.1987) (agency has obligation to address constitutional challenge to enforcement proceeding, but only to extent challenge is to agency's regulations rather than to statute because of "well known principle that regulatory agencies are not free to declare an act of Congress unconstitutional"). The agency has neither institutional competence nor expertise to bring to bear on the question whether § 235(c) may constitutionally be applied to a permanent resident alien.

The final purpose of the exhaustion requirement is to foster judicial economy. The INS contends, on three grounds, that permitting the administrative process to run its course may save the court time and energy. The Government first claims that we may not have to decide Rafeedie's challenges at all if the Regional Commissioner decides that § 235(c) does not, by its terms, apply to Rafeedie. This argument is without merit, however, for the Service has already determined that § 235(c) may be applied to Rafeedie—by applying it to him. *Cf. Atlantic Richfield Co. v. U.S. Department of Energy*, 769 F.2d 771, 783 (D.C. Cir.1984) ("by subjecting ARCO to adjudicatory proceedings, the Department has, 'for all practical purposes, made a final determination that such proceedings [are] within its statutory jurisdiction'") (*quoting Athlone Industries, Inc. v. CPSC*, 707 F.2d 1485, 1489–90 n. 30 (D.C.Cir.1983) (footnote omitted)). Moreover, before the District Director decided to apply § 235(c) to Rafeedie, he consulted with the General Counsel of the INS, who "is delegated the responsibility of chief legal officer for the Service." 8 C.F.R. § 103.1(g). Thus, the Service's position that § 235(c) may, by its terms, be applied to Rafeedie has been settled by the highest legal authority within the INS.

The Regional Commissioner is the only person left in the process, and the one who will make the decision as to whether Rafeedie should be excluded, and he is part of the same hierarchical organization that made the decision to apply § 235(c) here in the first instance. *See* 8 C.F.R. § 100.2(d) ("the regional commissioners are responsible for the administration and enforcement of all laws relating to immigration" in their geographic areas). As such, the Regional Commissioner is not authorized, as we understand the situation, now to reject the interpretation of the Service's "chief legal officer."

This case is therefore unlike one in which the plaintiff will have the opportunity to press his claims before an IJ independent of the agency's enforcement apparatus. In such a case, the IJ might well decide to reject the statutory interpretation pressed

upon him by the agency. In a § 235(c) matter, however, the enforcement branch of the agency is both the prosecutor and the judge; it is not reasonable to think that the Regional Commissioner in his capacity as the adjudicating officer would or could refuse to accept the legal opinion of the General Counsel, as proffered to him by the District Director in his capacity as prosecutor.

In an attempt to liken this case to one in which the agency's legal positions will be tested by an Administrative Law Judge, the INS cites to cases that upheld, against due process challenges, the combination of adjudicative and prosecutorial functions in a single agency. *See, e.g., Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975); *Jonal Corp. v. District of Columbia,* 533 F.2d 1192, 1196 (D.C.Cir. 1976). These cases, however, are entirely irrelevant. Rafeedie's claim here is not that allowing the Regional Commissioner to make the exclusion decision violates due process; it is merely that there is no practical possibility that the Regional Commissioner will take a legal position inconsistent with that adopted by the "chief legal officer" of the INS. It may be constitutional for the Regional Commissioner to decide Rafeedie's case; indeed, we do not understand him to argue otherwise. It does not follow, however, that the exhaustion requirement should be applied to bar this suit until the Regional Commissioner has acted. The two questions are quite different.

The Service's second argument from judicial efficiency is that this court will not have to rule on either the statutory or the constitutional claim if the Regional Commissioner decides, in the summary exclusion proceeding, that Rafeedie is not excludable. That the Regional Commissioner might so conclude is not a practical possibility, however. The District Director has information that he clearly believes to be reliable and, if believed, sufficient to warrant Rafeedie's exclusion. Aside from the theoretical possibility that the Regional Commissioner would apply a more rigorous standard of proof than even such unrebutted information can satisfy, Rafeedie—like Joseph K. in *The Trial*—can prevail before the Regional Commissioner only if he can rebut the undisclosed evidence against him, *i.e.,* prove that he is not a terrorist regardless of what might be implied by the Government's confidential information. It is difficult to imagine how even someone innocent of all wrongdoing could meet such a burden. Thus, while it is true in theory that the summary proceeding could be so resolved as to relieve this court of the need to decide the question pressed by Rafeedie, it is true in theory only.

The INS's final argument from judicial economy is that permitting the agency's process to take its course will result in the development of a factual record that will facilitate later judicial review of Rafeedie's claims. The most obvious flaw in this position is that there is no factual dispute relevant to our resolution of the constitutional issue. As we shall discuss, the only issues relevant to Rafeedie's due process claim are whether he is a permanent resident alien, which is not in dispute; whether his absence from the country was of a sufficient duration to deprive him of the protection of that status, a question of law; what processes have already been afforded him, a matter of record; and what, if any, additional processes are due him under § 235(c), also a question of law. Not a single fact relevant to any of these questions would be adduced in the findings of the Regional Commissioner, since the only issues in dispute before him are whether Rafeedie is a proponent of terrorism within the description of § 212(a)(28)(F), or an alien whom the INS reasonably believes to be seeking reentry into the United States for purposes inimical to the public interest, as described in § 212(a)(27).

Moreover, for the INS to suggest here that a significant factual record is likely to be developed in a summary proceeding is especially maladroit, since the Service invoked § 235(c) against Rafeedie in the first place precisely in order to avoid creating a factual record. In any event, given the extent to which the alien would be ignorant of the evidence against him in such a summary proceeding, any "factual record" that it would generate is unlikely to be more

than a catalogue of the Government's untested allegations and Rafeedie's not directly responsive denials of participation in activities that bring him within the scope of §§ 212(a)(27) and (28)(F).

Based upon the foregoing considerations, we conclude that the administrative and judicial interests in requiring Rafeedie to exhaust his administrative remedies are minimal.

### 2. *Irreparable Injury*

Turning to the other side of the balance, Rafeedie argues that he will be irreparably injured in three ways if he must exhaust the administrative procedure under § 235(c): (1) his First Amendment rights are being (and will continue to be) chilled by the pendency of the § 235(c) proceeding; (2) the practical necessity to provide all of his evidence and arguments to the INS in the summary proceeding will, even if he succeeds there, compromise his defense in any later exclusion proceeding; and (3) if found to be excludable in the summary proceeding, he will be immediately incarcerated and lose his right to work in the United States.

Rafeedie's first argument may actually be divided into two points. First, he makes the broad claim that the institution of any deportation or exclusion proceedings based on §§ 212(a)(27) or (28)(F) would have a chilling effect on his expressive activities, and thus violate his First Amendment rights; we reject this argument. The chilling effect of a pending exclusion proceeding is not one of which Rafeedie, as an alien, may complain. As we conclude below (at 26), the INS must be permitted to proceed against Rafeedie by way of a § 236 proceeding. Any injury attributable not to the summary nature of the proceedings but to the inherent chilling effect of there being any pending exclusion proceeding cannot be avoided, therefore, even if Rafeedie does not have to exhaust the administrative procedure of § 235(c) before pursuing his claims in court; such injury is therefore not properly cognizable for the purpose of analyzing whether the court should enjoin summary proceedings.

Rafeedie's second point—that bringing the charge under § 235(c), rather than § 236, has had substantial incremental chilling effects—we accept. If he were subject only to a plenary proceeding before an IJ, Rafeedie would know that he would be accorded fair procedures and that his exclusion would not be ordered arbitrarily or for illegal reasons. He would therefore feel free to continue his heretofore significant speaking and associational activities in opposition to United States policies in the Middle East. Because he is subject to a secret proceeding in which neither the substance underlying the charges against him nor the reason for any final order of exclusion need ever be disclosed, he is understandably concerned that he may be excluded not for terrorist or other illegitimate activities, but for his legitimate activities as an outspoken critic of the Government's foreign policy. The effects on his First Amendment rights of requiring him to undergo the § 235(c) proceeding before challenging it are therefore substantial.

Rafeedie's second claim of injury is that the practical necessity to provide, in the § 235(c) proceeding, all information about his activities abroad will prejudice him in any later exclusion proceeding. Rafeedie will suffer a judicially cognizable injury in that he will thus be deprived of a "substantial practical litigation advantage." Rafeedie spells out this dilemma: if he presents his defense in a § 235(c) proceeding, and a court later finds that section inapplicable to him, the INS will nevertheless know his defense in advance of any subsequent § 236 proceeding; if, however, he does not present his factual defense now, he risks foresaking his only opportunity to present a factual defense. *See Atlantic Richfield Co. v. U.S. Department of Energy*, 769 F.2d 771, 783–84 (D.C.Cir. 1984) ("ARCO has already been faced with the dilemma of having to choose between complying with the allegedly ultra vires discovery orders—and thus revealing materials that otherwise would remain confidential—and flouting the orders and facing the consequences should the Department ultimately be found to have had the power to issue the orders.") (footnote omitted). Raf-

eedie has thus established a significant and irreparable injury. In so ruling, we do not embrace or even address Rafeedie's further argument that providing all his evidence to the Regional Commissioner would deprive him of effective assistance of counsel in any later exclusion proceeding. This novel argument, for which Rafeedie has cited no authority, need not be reached in order to determine that Rafeedie will suffer irreparable injury if forced to exhaust the § 235(c) procedure.

Finally, the district court found that if a § 235(c) exclusion order is entered against him, Rafeedie will lose his liberty and his right to work in the United States. *Rafeedie v. INS*, 688 F.Supp. 729, 740, 754 (D.D.C.1988). These rights are "weighty" and "rank[ ] high among the interests of the individual." *Landon v. Plasencia*, 459 U.S. 21, 34, 103 S.Ct. 321, 330, 74 L.Ed.2d 21 (1982); 459 U.S. at 37, 103 S.Ct. at 332 (Marshall, J., concurring). Their loss would be especially severe in this case, since Rafeedie is the sole source of financial support for his family.

The INS concedes that, if the Regional Commissioner finds Rafeedie excludable, the Service could detain him and deprive him of his right to work, but it claims that the district court erred in thinking it a "certainty" that the Government will choose to exercise that power. 688 F.Supp. at 740. In fact, the INS points out, it has had that power since Rafeedie returned from Syria, yet it has not exercised it. The Service does not and can not represent that he *will* not suffer these consequences after the § 235(c) proceeding, however, and for good reason. Rafeedie has been charged with violations of §§ 212(a)(27) and (28)(F) of the Act, recall. In order to find him excludable, the INS must therefore determine that he entered the United States to perform acts "prejudicial to the public interest" (§ 212(a)(27)) or that he advocates, or is a member of an organization that advocates, political violence, illegal destruction of property, or sabotage (§ 212(a)(28)(F)). In order for the INS to parole him pending *habeas* review, however, it would have to find that it is "strictly in the public interest" that he not be detained. 8 U.S.C. § 1182(d)(5)(A). We would be greatly surprised if the INS were to conclude, at the same time, both that Rafeedie is excludable under the sections pursuant to which he has been charged (particularly on its theory that he is a high official of a terrorist organization), and that it is "strictly in the public interest" to allow him to move about freely for any substantial period of time. We feel justified in discounting this possibility and accepting Rafeedie's claim that he will almost certainly be detained when the summary proceeding is concluded against him.

### 3. *The Exhaustion Balance*

Although we are, in general, loathe to find that administrative remedies need not be exhausted, *see, e.g., Atlantic Richfield*, 769 F.2d at 781, the balance in this unusual case tips decidedly in that direction. There is very little in the way of administrative or judicial interests that would be served by allowing the § 235(c) process to take its course, while Rafeedie would be irreparably and seriously injured were we to delay review. We therefore affirm the district court on this narrow point.

■ Our affirmance does not extend more broadly to the court's jurisdiction to enter an injunction against proceedings brought under § 236. As should be manifest from the discussion above, the reason we have found the interests favoring exhaustion to be so weak is that the Regional Commissioner's ruling in the § 235(c) proceeding is a foregone conclusion. In a proceeding under § 236, on the other hand, Rafeedie will have an opportunity to rebut the evidence against him, and an IJ independent of the INS will evaluate the Service's arguments and reach a decision on the record. In such a proceeding, there is no basis for concern that the decisionmaker has prejudged the case. We therefore conclude that the district court erred, and we accordingly reverse, insofar as it asserted jurisdiction to enjoin the initiation of § 236 proceedings against Rafeedie.

Having found that the district court had jurisdiction over Rafeedie's § 235(c) claim,

we now proceed to the merits of his demand for provisional relief.

## IV. PRELIMINARY INJUNCTION

The ordinary considerations a court is to take into account in determining whether to issue a preliminary injunction are four: the plaintiff's likelihood of success on the merits; the irreparable injury he will suffer in the event that the injunction does not issue; the effect that issuance of the injunction would have on the other parties to the case; and the public interest. *See, e.g., Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958). The Government contends only that Rafeedie has failed to show that he will suffer irreparable injury. In the course of determining the antecedent question whether Rafeedie is entitled to be in court at all notwithstanding his failure to exhaust his administrative remedies, however, we concluded above that he has indeed proven that he will suffer significant and irreparable harm if he is not granted the relief he seeks on his § 235(c) claim. *See* above at 517–18.

Accordingly, we affirm the preliminary injunction to the extent that it bars the application of § 235(c) to Rafeedie.

## V. SUMMARY JUDGMENT

Although the principle of avoidance leads us to resolve all potentially dispositive statutory claims before proceeding to any constitutional challenge, § 235(c), by permitting summary exclusion proceedings to be used against "any alien," applies to a permanent resident and thus impels us to the constitutional questions. First, does the Due Process Clause attach to Rafeedie's attempt to reenter the United States, as it would to that of a citizen? If it does not, his cause is at an end; if it does, we must then ask what process he is due and whether the statute in question affords all that the Constitution guarantees.

### A. Rafeedie's Entitlement to Due Process

 Before we address the question whether Rafeedie is entitled by the Consti-

tution to any procedural safeguards when the Government would deprive him of his liberty, we pause to clarify a source of potential confusion in the relevant cases. The Supreme Court appeared at one time to suggest that, for aliens initially entering this country, the congressionally prescribed process is, *ipso facto,* due process. *See, e.g., Knauff v. Schaughnessy,* 338 U.S. 537, 544, 70 S.Ct. 309, 313, 94 L.Ed. 317 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.... [W]e are dealing here with a matter of *privilege.* Petitioner had no vested *right* of entry" such as to limit "retroactive operation of regulations affecting her status.") (emphases in original). As we read *Knauff,* it does not rest on the proposition that an initial entrant is entitled to due process of law before he can be denied entry but that any process provided by statute, no matter how truncated, constitutes all the process due, by the mere fact that Congress prescribed no more. If that were the Court's implication, then the Due Process Clause would apply to, but have no operational significance for, the class of cases presented by aliens denied initial entry into the United States; Congress could unilaterally determine what satisfies the constitutional requirement of due process. That may have been the Framer's intent. *See* Blackstone, 1 *Commentaries* 137 (1765) ("... justice is directed [by Magna Carta] to be done according to the law of the land: and what that law is ... is permanent, fixed, and unchangeable, *unless by authority of parliament*") (emphasis added); Coke, 2 *Institutes* 46, *quoted in Hurtado v. California,* 110 U.S. 516, 523, 4 S.Ct. 111, 114, 28 L.Ed. 232 (1884) (equating Magna Carta's reference to "the law of the land" with "the due course and process of the law"). The Supreme Court long ago determined, however, that the due process concept has a content independent of legislative or common law usage, *see, e.g., Murray's Lessee v. Hoboken Land and Improvement Co.,* 18 How. 272, 276, 15 L.Ed. 372 (1855) (the Due Process Clause "is a restraint on the legislative as well as on the executive and judicial powers

of the government, and cannot be so construed as to leave congress free to make any process 'due process of law,' by its mere will"), and contemporary due process jurisprudence is built upon that foundation. Rather than unsettling the edifice of due process in this casual manner, therefore, we read the *Knauff* Court merely to have been observing that an initial entrant has no liberty (or other) interest in entering the United States, and thus has no constitutional right to *any* process in that context; whatever Congress by statute provides is obviously sufficient, so far as the Constitution goes.

Our starting point, therefore, is that an applicant for initial entry has no constitutionally cognizable liberty interest in being permitted to enter the United States. In contrast, a permanent resident alien (at least in general, as even the INS admits) has a liberty interest in being permitted to reenter this country and is therefore entitled to due process before he can be denied admission. *See, e.g., Chew*, 344 U.S. at 591–92, 73 S.Ct. at 474–75. The question presented by this case, then, is whether a permanent resident alien forfeits his liberty interest in admission to the United States— and hence his right to due process upon reentry—by leaving the country to engage in "sufficiently nefarious" activities. We proceed now to the Supreme Court's learning relevant to this question.

In *Chew*, a permanent resident alien (Kwong) left the United States, apparently for four months, as a seaman on a United States vessel that made calls at several foreign ports. Upon his return to the United States, the INS detained him under the regulation from which § 235(c) is (almost verbatim) derived and sought to exclude him without a hearing. Ostensibly in order to avoid reaching the constitutional issue, 344 U.S. at 602, 73 S.Ct. at 480, the Court decided that, as a matter of statutory construction, the regulation could not be applied to a permanent resident alien who had made a brief trip outside the United States. The Court's reasoning made transparent, however, that the regulation would have been unconstitutional if read otherwise:

We do not regard the constitutional status which petitioner indisputably enjoyed prior to his voyage as terminated by that voyage. From a constitutional point of view, he is entitled to due process without regard to whether or not he is to be treated as an entrant alien....

*Id.* at 600, 73 S.Ct. at 479. That *Chew* was a constitutional decision was made clear by three subsequent decisions of the Supreme Court: *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 213, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953) (*Chew* held "that under some circumstances temporary absence from our shores cannot constitutionally deprive a returning lawfully resident alien of his right to be heard"); *Rosenberg v. Fleuti*, 374 U.S. 449, 460, 83 S.Ct. 1804, 1811, 10 L.Ed.2d 1000 (1963) (*Chew* held "that the returning resident alien is entitled as a matter of due process to a hearing on the charges underlying any attempt to exclude him ..."); and *Landon v. Plasencia*, 459 U.S. 21, 33, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982) ("[a]ny doubts that *Chew* recognized constitutional rights in the resident alien returning from a brief trip abroad were dispelled by [*Fleuti* ]").

In the first of these cases, *Mezei*, the Court distinguished *Chew* on the ground that Mezei, also a resident alien, left the United States without authorization or reentry papers and "remained behind the Iron Curtain for 19 months," while Kwong had been gone but four months. 345 U.S. at 214, 73 S.Ct. at 630. Moreover, in *Chew* the Court had relied on a statute providing that maritime service does not interrupt continuous residence for naturalization purposes; in *Mezei*, on the other hand, the Court noted that "protracted absence" is a break in residence for naturalization purposes. *Id.* Thus, the Court held, *Chew* was not controlling, and Mezei could be excluded without due process.

The second case, *Fleuti*, involved not whether a resident alien was entitled to due process in an exclusion proceeding, but whether he could be subjected to an exclusion proceeding at all. The relevant statute provided (and provides) that only an alien who is "entering" the United States is subject to exclusion (rather than deporta-

tion) and that an alien would not be deemed to be "entering" the country if his absence from the United States "was not intended or reasonably to be expected by him" or "was not voluntary." 8 U.S.C. § 1101(a)(13). The Court's earlier cases had interpreted the statute literally to mean that if an alien intentionally and voluntarily left the United States, he could be subject, upon attempting to return, to exclusion rather than to deportation proceedings. In *Fleuti*, however, the Court, recognizing that many lower courts had applied its approach only "with express reluctance and explicit recognition of its harsh consequences," 374 U.S. at 454, 83 S.Ct. at 1808, and that Congress had since amended the statute to codify the definition of "entry," interpreted it "nonrestrictively," *id.* at 459, 83 S.Ct. at 1810, to provide that if an alien's trip abroad were "innocent, casual, and brief," *id.* at 461, 83 S.Ct. at 1811–12, he would not be deemed to have made an "entry" upon his return. Thus, the resident alien who had gone to Mexico for "about a couple hours," *id.* at 450, 83 S.Ct. at 1806, was not excludable.

Lastly, *Plasencia* involved both the entry and the due process questions. There, a permanent resident alien had gone to Mexico for "a few days" in order to assist Mexican and Salvadoran nationals to enter the United States illegally. 459 U.S. at 23, 103 S.Ct. at 324. The Court first held that, although her absence had been "brief," her return to the United States might well be an "entry" under *Fleuti:*

> If ... "the purpose of leaving the country is to accomplish some object which is itself contrary to some policy reflected in our immigration laws, it would appear that the interruption of residence thereby occurring would properly be regarded as meaningful [for the purpose of determining whether an 'entry' has occurred]."

*Id.* at 29, 103 S.Ct. at 327 (*quoting Fleuti*, 374 U.S. at 462, 83 S.Ct. at 1812). The Court went on to hold, however, that even if Plasencia had made an "entry," she was entitled to due process. In this regard, the Court relied on *Chew* and distinguished *Mezei:*

> If the permanent resident alien's absence is extended, of course, he may lose his entitlement to "assimilat[ion of his] status" [*Chew*, 344 U.S. at 596, 73 S.Ct. at 477], to that of an alien continuously residing and physically present in the United States. In [*Mezei* ], this Court rejected the argument of an alien who had left the country for some 20 months that he was entitled to due process in assessing his right to admission on his return.... We need not now decide the scope of *Mezei*, for Plasencia was absent from the country only a few days, and the United States has conceded [on brief and at oral argument] that she has a right to due process.

*Id.* at 33–34, 103 S.Ct. at 330. Because the parties had not briefed the issue of "the contours of the process that is due," *id.* at 32, 103 S.Ct. at 329, the Court remanded the case for an inquiry into the constitutional adequacy of the procedures that the INS had afforded Plasencia. *Id.* at 34–37, 103 S.Ct. at 330–32.

In the present case, the district court appears to have concluded that the *Fleuti* standard for determining whether a statutory "entry" has occurred—whether the alien's trip abroad was "innocent, casual, and brief"—is also the appropriate test for determining whether an entering alien is entitled to due process. 688 F.Supp. at 749. Thus, the district court was of the view that *Chew* and *Mezei* both revolved around the "circumstances of the aliens' trips abroad," and that *Fleuti* was merely "a restatement of the factors set forth" in those decisions. *Id.* at 748.

If *Fleuti* set out the appropriate test for both the statutory and the constitutional questions, then a resident alien who is "entering" the United States would never be entitled to due process. But such an interpretation would be inconsistent with *Plasencia*. There, the Court found that, regardless of whether Plasencia had "entered" the United States, she was entitled to due process in view of the brevity of her trip abroad.

Hence, the INS does not interpret the district court to have held that *Fleuti* gov-

erns, but merely that the *Fleuti* factors are the same factors that the court should consider in deciding whether an alien is entitled to due process. While continuing to suggest that *Fleuti* might indeed provide the appropriate test for both the "entry" and the due process questions, the INS argues that

> a court could logically conclude that while an alien's absence was not sufficiently brief or innocent to warrant treating him as though he had never left the country, it *was* sufficiently brief or innocent to prevent him from losing the due process benefits of his permanent resident status.

(Emphasis in original.) The Service reconciles this interpretation of the district court's opinion with *Chew* and *Mezei* by downplaying the extent to which those cases were based upon the length of the alien's absence and emphasizing the "circumstances" of the aliens' respective journeys.

We are unpersuaded. In *Plasencia*, the Court considered the purpose of the alien's trip relevant to a determination whether she had made an entry. In discussing the due process question, however, the Court's readings of *Chew* and *Mezei* were straightforward; it expressly stated that *Mezei* did not control because Plasencia's trip was not lengthy. Indeed, in its due process discussion, the Court did not so much as mention her purpose in going abroad. 459 U.S. at 33–34, 103 S.Ct. at 329–30. It may well be that attending a conference of an organization that is allegedly associated with a terrorist group is "more nefarious" than assisting illegal immigration into the United States; even so, it cannot be said that smuggling illegal aliens into the United States is "innocent," such that the Court would ignore it entirely in determining, based upon the *Fleuti* factors, whether the alien was entitled to due process. The only explanation for *Plasencia* is that the degree of nefariousness of the alien's trip was irrelevant to the due process inquiry; for that purpose, the only relevant question was whether the alien had been gone so long as to lose her permanent resident status.

The conclusion that the length of the alien's absence is the determining factor is buttressed by an examination of the relevant naturalization statute. As we have said, in both *Chew* and *Mezei* the Court looked to the naturalization laws to determine what would be a sufficient time abroad to divest the alien of his due process rights. In *Chew*, the alien's absence from the country would not have, and in *Mezei* it would have, constituted an "interruption in residence" for naturalization purposes. Here, Rafeedie's absence from the United States during his alleged trip to Syria would not interrupt his resident status for naturalization purposes. *See* 8 U.S.C. § 1427(a) (absence of less than six months deemed not to interrupt continuous residence for naturalization purposes). In this regard, too, therefore, *Chew* and *Mezei* together suggest that Rafeedie retains his constitutional entitlement to due process.

Moreover, it is clear that, in defining an alien's right to due process, the Supreme Court is concerned with whether he is a permanent resident. *See Plasencia*, 459 U.S. at 32, 103 S.Ct. at 329 ("[O]nce an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly."). A permanent resident may have not only significant personal ties to the United States, as does Rafeedie, whose wife and child are citizens; he may also have, and have discharged, substantial legal obligations to this country. 50 U.S.C.App. § 456(a)(1) (permanent resident aliens subject to same obligation as to training and service in armed forces as citizens); 50 U.S.C.App. § 453(a) (permanent resident alien required to register for draft). These ties give the permanent resident alien a stake in the United States substantial enough to command the protection of due process before he may be excluded or deported; the result, after all, may be to separate him from family, friends, property, and career, and to remit him to starting a new life in a new land. Only if he has been absent from this country for such a period that he may be deemed to have abandoned his permanent

resident status here, is he, on his return to the United States, to be treated as if he were an initial entrant for due process purposes.

Although our review of the cases convinces us that Rafeedie did not lose his due process rights merely because the INS alleges that, while abroad, he engaged in "nefarious" activities, we pause briefly to consider the Government's final argument that it "would be rendered powerless to protect the nation," if it were not permitted to exclude Rafeedie free of the burden of providing him with due process. There are, of course, national security concerns involved in this case, but it is by no means clear that the national security requires that § 235(c) limit the process otherwise due a permanent resident. The INS has always interpreted § 235(c) *not* to apply to permanent resident aliens, with one exception, in which it was rebuffed in court. *See Kasel de Pagliera*, 139 F.Supp. 143 (application of § 235(c) to permanent resident alien unconstitutional). Indeed, in the proceeding by which the INS excluded Shihadeh (allegedly one of Rafeedie's companions on his trip to Syria, *see* above at 5), the Government's attorney stated that "in this particular case the alien is a lawful permanent resident, [and] he is entitled to a hearing." Transcript, *Re: Sulieman Ahmad Shihadeh* at 62 (May 22, 1986). The Government points to no special effect on our national security that would ensue from Rafeedie's case if the INS follows its nearly consistent past practice, and it has advanced no reason to think that its past practice has been proved mistaken.

Most important, even a manifest national security interest of the United States cannot support an argument that Rafeedie is not entitled, as a threshold matter, to protection under the Due Process Clause. Once across that threshold, the calculus of just how much process is due involves a consideration of the Government's interests in dispensing with procedural safeguards. *See, e.g., Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). Thus, the INS's national security arguments may be renewed and considered when the district court first considers what

process is due. They are not relevant, however, to whether Rafeedie has any due process entitlement at all.

The error of the INS's position is compounded by its formalism. Insofar as the Service has described it, the confidential information on which the Government relies to establish Rafeedie's excludability concerns not what he did on his trip to Syria, but rather actions he allegedly took years before. (*See supra*, at 514–15.) If he had never left the United States, the INS would have had to deport him, with all the procedural safeguards such a course would entail. The INS does not suggest that a resident alien charged with terrorist activities inside the United States could constitutionally be denied due process in the deportation context. Yet, the INS contends that the fortuity of his trip abroad— which it concedes is too brief to work a forfeiture, on durational grounds alone, of any due process rights he may have—not only subjects him to the more limited procedural safeguards of an exclusion proceeding (which, by statute, it surely does if the trip was not "innocent, casual, and brief"), but in fact defeats his preexisting constitutional right to due process. The constitutional inference is without any obvious rationale, and the INS supplies no non-obvious explanation for this catch-as-catch-can approach to the Due Process Clause.

The INS's arguments reduce to the claim that when the Government asserts that an alien has gone abroad for a "nefarious" purpose, he should not be entitled to due process in determining whether the Government's assertions are accurate. As the INS states the point,

> the issue is whether Mr. Rafeedie can claim the full due process rights of a permanent resident in light of *allegations* that he has undertaken activities in a foreign country that contravene the national security interests of the United States.

(Emphasis added.) If that is the issue, then the Government's position is worse than unsound; it is at war with the fundamental purpose of the due process guarantee. The Government cannot assert as an

argument against procedural safeguards that the accused is guilty as charged. The whole point of due process is that the facts must be determined according to certain procedures that have been agreed upon in advance for reasons of enduring policy divorced from the exigencies of any particular case.

Rafeedie was therefore entitled to summary judgment on his claim that the Constitution guarantees him due process of law. He is not, however, entitled to summary judgment on the issue of whether he has been denied due process in this case.

## B. What Process is Due

There can be no doubt that, as a permanent resident alien, Rafeedie has a liberty interest in remaining in the United States, which is protected by the Due Process Clause of the Fifth Amendment. Because the district court concluded that there was a genuine issue of material fact bearing on whether Rafeedie has any constitutional entitlement to due process at all (*i.e.*, as to whether his trip abroad was "innocent, casual, and brief"), it never reached the question whether the process that has been afforded him is constitutionally sufficient; nor did the parties argue that question before this court. We therefore remand this action to the district court for an initial determination whether Rafeedie has received due process.

Rafeedie is in the unusual position of challenging a process not entirely before, and certainly not after, it has taken its course, but effectively in its midst. As we held in *Hastings II*, 829 F.2d at 94, however, a facial challenge does not lie against a process that has already been applied, or we may add, insofar as it has already been applied. Thus, Rafeedie cannot here pursue an entirely facial challenge. To the extent that the INS has, in some particulars, granted Rafeedie more than the statute requires, the district court should, in determining whether the Fifth Amendment has been satisfied, consider the processes that have actually been afforded him. As to the portion of the proceeding yet to come, however, Rafeedie's challenge is a

facial one. The INS will therefore not be heard to say that the Regional Commissioner may decide to give Rafeedie a hearing or some other protection neither required by § 235(c) nor given to him thus far. Except to the extent that the Service has already given him more than § 235(c) requires, the question before the district court is whether that statute provides on its face process that is constitutionally sufficient for a permanent resident alien.

In *Mathews v. Eldridge*, 424 U.S. at 333, 96 S.Ct. at 902, the Supreme Court reminded us that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner'" (*quoting Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). The Court then set forth three factors to inform a court's decision in a given case whether due process has been satisfied:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335, 96 S.Ct. at 903. These questions are to be asked not merely with reference to a single case, but having in mind the type of case it is, with regard to the run of such cases. A record bearing on the characteristics of the category of such cases may, therefore, be necessary. *Santosky v. Kramer*, 455 U.S. 745, 761–68, 102 S.Ct. 1388, 1399–1402, 71 L.Ed.2d 599 (1982) (considering the general attributes of the type of case rather than the special circumstances of the particular case); *Eldridge*, 424 U.S. 319, 340–50, 96 S.Ct. 893, 905–10, 47 L.Ed.2d 18 (1976) (same); *Goldberg v. Kelly*, 397 U.S. 254, 264–66, 90 S.Ct. 1011, 1018–19, 25 L.Ed.2d 287 (1970) (same). *But see Lassiter v. Department of Social Services*, 452 U.S. 18, 32–33, 101 S.Ct. 2153, 2162, 68 L.Ed.2d 640 (1981) (upholding administrative termination of pa-

rental rights where mother was unrepresented on ground that the particulars of her case were simple enough that counsel was not constitutionally required).

The relevant considerations in this case therefore include: (1) the importance to the permanent resident alien and others like him of not being imprisoned and forced to leave the United States; (2) the risk that such an alien will erroneously suffer such harm under the procedure set forth in § 235(c), together with the likelihood that giving the alien more procedural protections will reduce that risk; and (3) the interests of the Government, on behalf of the public, in summarily excluding terrorists and other undesirables from our shores and in avoiding the cost of additional safeguards for permanent resident aliens subject to § 235(c) exclusion proceedings. We leave the development of a record bearing on these questions, and their resolution in the first instance, to the district court.

## VI. CONCLUSION

For the foregoing reasons, we find that the district court had jurisdiction to consider this case and properly excused Rafeedie's failure to exhaust his administrative remedies before pursuing his due process challenge to § 235(c). We affirm the order of the district court granting a preliminary injunction prohibiting the initiation or continuation of § 235(c) proceedings, but we reverse the order insofar as it limits the INS's authority to proceed with exclusion proceedings under § 236. Further, we remand this action to the district court for the entry of partial summary judgment for Rafeedie, consistent with the foregoing

opinion, and for further proceedings on the question whether the combination of the procedural protections that have been afforded Rafeedie thus far and the limited protections that § 235(c) requires the INS to give him in the future satisfies the constitutional requirement of due process.

*So Ordered.*

RUTH B. GINSBURG, Circuit Judge, concurring:

All judges on the panel agree on a core point; as characterized in the dissenting opinion, "the government's basic position" on the handling of Rafeedie's case is "profoundly troubling." Dissent *infra*, at 530–31. The panel is also united on this fundamental matter: Federal courts ultimately have authority (jurisdiction), under the Constitution and federal statutes, to determine the legality of Rafeedie's exposure to exclusion by summary process based on secret information. We part company not on *whether* there is federal court jurisdiction over Rafeedie's complaint, but on the lesser questions—essentially "ripeness" and venue issues—of time and place, *when* and *where*.[1] The court holds that Rafeedie's complaint is properly heard here and now; the dissent would schedule it later and in a different federal circuit.

I agree with the rationale set forth in the opinion of the court for finding sections 106(b) and (c) inapplicable to Rafeedie.[2] *See* Ct.Op. *supra*, at 511–13. First, the language and legislative history of section 106(b) securely indicate that Congress intended to make habeas the exclusive route to judicial review only for plenary exclusion proceedings under section 236;[3] section

---

**1.** *Cf. United States v. Kember,* 648 F.2d 1354, 1357–59 (D.C.Cir.1980) (per curiam) (commenting on "manifold settings in which we employ the term [jurisdiction]" and distinguishing fundamental "jurisdiction" questions from issues of a less basic character).

**2.** Those sections provide, in pertinent part:
 (b) Notwithstanding the provisions of any other law, any alien against whom a final order of exclusion has been made heretofore or hereafter under the provisions of section 1226 [section 236] of this title or comparable provisions of any prior Act may obtain judi-

cial review of such order by habeas corpus proceedings and not otherwise.
 (c) An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations....
8 U.S.C. § 1105a(b) & (c) (1982).

**3.** The INS, notably, does not press the argument that Rafeedie must pursue his claims only via habeas, but merely alludes to that position in a footnote in its reply brief. Reply Brief of INS at 4 n. 1.

106(c)'s reference to exclusion proceedings is most logically read as similarly limited. Second, even if section 106(c)'s exhaustion requirement can fairly be read as applicable, generally, to summary proceedings under section 235(c), it is doubtful that Congress intended section 106(c) to apply to permanent resident aliens involved in section 235(c) proceedings. I write separately solely to express my view that even if section 106(c) were applicable to permanent resident aliens subjected to summary exclusion proceedings, Rafeedie's failure to exhaust administrative remedies may, and should, be excused in this case.

The dissent posits a sharp divide between the prudential exhaustion doctrine and statutory exhaustion requirements. Dissent *infra*, at 532–34, 542 n. 13. The former establishes a judge-made condition for judicial review that courts may dislodge when the balance of the equities so dictates. *See McKart v. United States*, 395 U.S. 185, 197, 89 S.Ct. 1657, 1664, 23 L.Ed.2d 194 (1969). But, according to the dissent, "[a]n explicit statutory exhaustion requirement is jurisdictional; it deprives federal courts of general federal question jurisdiction to entertain an ancillary action under the APA prior to exhaustion." Dissent *infra*, at 532; *see also id.* at 542 n. 13. Therefore, the dissent maintains, if section 106(c) is applicable to Rafeedie, "no federal court has jurisdiction to intervene" prior to exhaustion of administrative remedies, regardless of whether the harm threatened by requiring exhaustion far outweighs any administrative or judicial interest in allowing the agency process to run its full course. *Id.* at 532. I believe the dissent misreads Supreme Court precedent and, correlatively, wrongly construes the import of section 106(c). As I see it, a statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not impose an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition. In other words, a statutory exhaustion requirement ordinarily functions as a tighter restraint than the judge-made rule, but is not an utterly unbreachable barrier.

As support for its absolutist view of statutory exhaustion requirements, the dissent relies only on *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975).[4] In *Salfi*, the Supreme Court confronted the question whether section 405(g) of the Social Security Act, 42 U.S.C. § 405(g) (1982), allowed the district court to entertain, prior to exhaustion of administrative remedies, an action challenging the constitutionality of the Act's duration-of-relationship eligibility requirements for surviving wives and stepchildren of deceased wage earners. Section 405(g) provides, in pertinent part:

Any individual, after any final decision of the Secretary [of the Department of Health, Education, and Welfare, now redesignated the Department of Health and Human Services (HHS)] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action [in a district court of the United States] commenced within sixty days....

*Id.* As the dissent notes, Dissent at 542 n. 13, the Supreme Court stated that section 405(g)'s requirement of a "final decision" "is a statutorily specified jurisdictional prerequisite. The requirement is, therefore ... something more than simply a codification of the judicially developed doctrine

---

**4.** The dissent's reliance on *Salfi* is only partial. It cites *Salfi*'s general statements about judicial exhaustion requirements but then attempts to distinguish *Salfi*'s holding. Dissent *infra*, at 533–34. It is *Salfi*'s holding, of course, and the holdings of *Eldridge* and *Bowen v. City of New York*, 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986), by which we should be guided.

*Coit Independence Joint Venture v. Federal Savings and Loan Insurance Corp.*, ── U.S. ──, 109 S.Ct. 1361, 1372, 103 L.Ed.2d 602 (1989), also cited by the dissent, merely repeats *Salfi*'s general statement that exhaustion is normally required "where Congress imposes an exhaustion requirement by statute." *Coit* itself, however, did not involve a statutory exhaustion requirement. *Id.* 109 S.Ct. at 1374; *cf. id.* at 1376 (Scalia, J., concurring in part and concurring in the judgment) ("This case is not about exhaustion, it is about pre-emption.").

of exhaustion, and may not be dispensed with merely by a judicial conclusion of futility...." 422 U.S. at 766, 95 S.Ct. at 2467.

The dissent's rendition of *Salfi*, however, is incomplete. In the sentence immediately following the one quoted above, the Supreme Court continued: "But it is equally true that the requirement of a 'final decision' contained in § 405(g) is not precisely analogous to the more classical jurisdictional requirements contained in such sections of Title 28 as 1331 [federal question] and 1332 [diversity]." *Id.* The Court then went on to decide that the Secretary could waive section 405(g)'s exhaustion requirement in particular cases if exhaustion did not "serve his own interests in effective and efficient administration." *Id.*;[5] *accord Mathews v. Diaz*, 426 U.S. 67, 75–77, 96 S.Ct. 1883, 1889–90, 48 L.Ed.2d 478 (1976).

Shortly after *Salfi*, in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed. 2d 18 (1976), the Supreme Court further clarified that the Social Security Act's administrative exhaustion requirement is not an absolute, unwaivable prerequisite to judicial review. *Eldridge* involved a due process challenge to the Social Security Administration's practice of terminating disability payments without a prior evidentiary hearing. The Court held that the district court had authority to relieve a claimant from the exhaustion requirement even when the Secretary did not consider the administrative decision final. *Id.* at 330–32, 96 S.Ct. at 900–01. As the Court stated, the judge's decision to admit an exception to a statutory exhaustion requirement should depend on "the nature of the claim being asserted and the consequences of deferment of judicial review." *Id.* at 331 n.

11, 96 S.Ct. at 901 n. 11. Waiver was appropriate in *Eldridge*, the Court concluded, for these reasons: (1) the claimant's interest in having his constitutional challenge "resolved promptly is so great that deference to the agency's judgment [that exhaustion is required] is inappropriate"; and (2) the constitutional challenge was "entirely collateral to [the claimant's] substantive claim of entitlement." *Id.* at 330, 96 S.Ct. at 900.

Finally, the Supreme Court's decision in *Bowen v. City of New York*, 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986), should have laid to rest the dissent's contention that courts may never allow an exception to a statutory exhaustion requirement. That case presented a challenge to an internal HHS policy pursuant to which claimants had been denied disability benefits. The Court reiterated its holding in *Eldridge* that a court may effectively waive section 405(g)'s exhaustion requirement if the action is "collateral" to a claim for benefits and if requiring exhaustion is likely to cause the claimant irreparable harm. *Id.* at 483, 106 S.Ct. at 2031. The Court then stated that "application of the exhaustion doctrine is 'intensely practical'" and should "be guided by the policies underlying the exhaustion requirement." *Id.* at 484, 106 S.Ct. at 2032 (quoting *Eldridge*, 424 U.S. at 331 n. 11, 96 S.Ct. at 901 n. 11).

"Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the court the benefit of its experience and expertise, and to compile a

---

**5.** The Court ruled that although claimants need not always exhaust their administrative remedies, they must at least file a claim for benefits with the Secretary before seeking judicial review. *Salfi*, 422 U.S. at 764, 95 S.Ct. at 2466. As the Court explained in *Mathews v. Eldridge*, 424 U.S. 319, 328, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976):

> Implicit in *Salfi* ... is the principle that [section 405(g)'s "final decision"] condition consists of two elements, only one of which is purely "jurisdictional" in the sense that it can-

not be "waived" by the Secretary in a particular case. The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted. The nonwaivable element is the requirement that a claim for benefits shall have been presented to the Secretary.

There is no comparable "nonwaivable element" in the Immigration and Naturalization Act for aliens like Rafeedie; the INS, not the alien, initiates proceedings.

record which is adequate for judicial review."

*Id.* (quoting *Salfi,* 422 U.S. at 765, 95 S.Ct. at 2467). Where those purposes ·are not served, the Court held, failure to exhaust administrative remedies should not be fatal to a claimant's request for judicial review. *Id.* at 484–85, 106 S.Ct. at 2032–33.[6]

*Salfi* and the decisions following it thus refute the dissent's contention that statutory exhaustion requirements in general countenance no exceptions and preclude any balancing analysis. Furthermore, most courts that have considered the specific statutory exhaustion requirement at issue in this case—section 106(c) of the Immigration and Naturalization Act—have held that a court may proceed, despite noncompliance with that requirement, in certain circumstances. *See, e.g., Bagues–Valles v. INS,* 779 F.2d 483, 484 (9th Cir. 1985) (excusing failure to exhaust because agency had "no jurisdiction to adjudicate constitutional issues" and due process claims did "not concern 'procedural errors correctable by the administrative tribunal'") (quoting *Reid v. Engen,* 765 F.2d 1457, 1461 (9th Cir.1985)); *Ramirez–Osorio v. INS,* 745 F.2d 937, 939 (5th Cir.1984) (holding that "exhaustion is not required when administrative remedies are inadequate"); *Jean v. Nelson,* 727 F.2d 957, 981 (11th Cir.1984) (en banc), *aff'd,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985)

(allowing exception to exhaustion requirement where remaining administrative remedies could not cure alleged defect in agency procedures); *Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1033–36 (5th Cir. 1982) (same); *id.* at 1034 (noting that "the exhaustion requirement is not a jurisdictional prerequisite but a matter committed to the sound discretion of the trial court").

Of the two cases the INS cites to support its assertion that section 106(c) is "jurisdictional," *Dhangu v. INS,* 812 F.2d 455 (9th Cir.1987), and *Garcia–Mir v. Smith,* 766 F.2d 1478 (11th Cir.1985) (per curiam), *cert. denied,* 475 U.S. 1022, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986), only the latter directly supports the unyielding construction urged by the dissent. *See id.* at 1489 (stating that exhaustion is "an absolute prerequisite to judicial review").[7] Although the court in *Dhangu* did label section 106(c) "a jurisdictional requirement," 812 F.2d at 460, it nevertheless suggested that the requirement may be waived in certain circumstances. The court began by stating that an alien must exhaust his administrative remedies "[o]rdinarily." *Id.* It then agreed with the alien's contention "that it is not always necessary to raise constitutional issues prior to [the] court's review." *Id.* The *Dhangu* court concluded, however, that exhaustion should be required in that case because the agency might correct

---

**6.** The Court excused the claimants' failure to exhaust their administrative remedies because requiring exhaustion in that case might have caused irreparable medical harm to the claimants and would not have served the purposes underlying the exhaustion requirement, as the agency was unlikely to correct its own errors and the district court would not have benefitted from the development of a factual record or the application of agency expertise. *Bowen v. City of New York,* 476 U.S. at 484–85, 106 S.Ct. at 2032–33. Notably, with regard to the possible injury to the claimants, the Court stated: "We should be especially sensitive to this kind of harm where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place." *Id.* at 484, 106 S.Ct. at 2032. The same may be said of Rafeedie—it would be pointless to require him to exhaust an administrative procedure which all three members of this court seem to agree is not applicable to him merely so

he can receive, in the end, the correct procedure.

**7.** Several factors, however, render *Garcia–Mir* a shaky prop. First, the court suggested in a footnote that courts may proceed despite a failure to meet statutory exhaustion requirements when the matter is not "within the competence of the agency," such as a constitutional question. 766 F.2d at 1489 n. 13. Unlike the claims in *Garcia–Mir,* Rafeedie's claim is constitutional, and therefore outside the INS's competence. Second, seventeen months before *Garcia–Mir,* the same circuit, sitting en banc, waived section 106(c)'s exhaustion requirement. *See Jean v. Nelson,* 727 F.2d 957, 981 (11th Cir.1984) (en banc), *aff'd,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). Finally, *Garcia–Mir* was decided before the Supreme Court's affirmation in *Bowen v. City of New York* of the "practical" nature of the exhaustion analysis in cases involving a statutory exhaustion requirement. *See* 476 U.S. at 484, 106 S.Ct. at 2032.

the alleged procedural error and because the alien's constitutional claims depended on unresolved factual questions. *Id.* at 460–61 (citing *Bagues–Valles*, 779 F.2d at 484). If the *Dhangu* court believed section 106(c) posed an impassable barrier to unexhausted claims, it would have had no cause to consider whether the policy objectives of the exhaustion requirement would be served by commanding exhaustion in that case. Nor would the court have cited its prior decision in *Bagues–Valles* allowing release from the exhaustion requirement.

In light of Supreme Court and circuit court precedent, then, I see no basis for the dissent's super rigid construction of section 106(c), its utter failure to distinguish "Jurisdiction" writ large from "jurisdiction" writ small. *See United States v. Kember*, 648 F.2d 1354, 1357–59 (D.C.Cir.1980) (per curiam); *see also Center for Nuclear Responsibility, Inc. v. U.S. Nuclear Regulatory Comm'n*, 781 F.2d 935, 945 n. 4 (D.C. Cir.1986) (Ruth B. Ginsburg, J., dissenting). Indeed, even the INS does not press the "jurisdictional" argument as far as the dissent takes it, conceding that "[p]recedent ... supports waiver of statutory *or* jurisprudential exhaustion in ... a very narrow category of cases." Opening Brief of INS in No. 88–5240, at 30 (emphasis added); *see also* Reply Brief of INS in No. 88–5240, at 5. Certainly, when Congress sees fit to instruct exhaustion in specific terms, courts should be especially hesitant to allow litigants to bypass administrative procedures. I cannot believe, however, that, in codifying an exhaustion rule, Congress inevitably and inexorably means to preclude early judicial review even when requiring exhaustion in a specific case would serve none of the purposes motivating the requirement and would threaten grievous harm to the person seeking review.

Once it is recognized that section 106(c)'s exhaustion requirement is not exceptionless, the dispositive question becomes whether the rule bears avoidance in this special case. The opinion of the court recounts in detail why the prudential exhaustion doctrine does not bar Rafeedie's present challenge. Ct. Op. *supra*, at 513–19. The same factors count in determining

whether section 106(c)'s exhaustion requirement precludes early judicial review. *Compare Bowen v. City of New York*, 476 U.S. at 483–86, 106 S.Ct. at 2031–33, *with McKart*, 395 U.S. at 193–95, 89 S.Ct. at 1662–63, *and Andrade v. Lauer*, 729 F.2d 1475, 1484 (D.C.Cir.1984). Taking into account the extra solicitude we should accord Congress' exhaustion instruction, it is nonetheless evident from the discussion of the relevant factors in the opinion of the court that exhaustion should not be insisted upon here. I will recap the reasons briefly.

Rafeedie's constitutional claim is entirely collateral to the merits of the prospective exclusion proceeding, *see Bowen v. City of New York*, 476 U.S. at 483, 106 S.Ct. at 2031; *Eldridge*, 424 U.S. at 330, 96 S.Ct. at 900: he does not request an early judicial determination of whether he is excludable on the basis of the substantive charges brought against him, but challenges only the constitutionality of the INS's subjecting him to a section 235(c) proceeding. This claim is outside the scope of the INS's decisional authority. Furthermore, because it is exceedingly unlikely that the INS will provide Rafeedie with sufficient procedural safeguards beyond those required by section 235(c), Rafeedie's constitutional claim would, in all likelihood, remain unchanged after the administrative process had run its course. *See* Ct.Op. *supra*, at 514–15. This is therefore not a case in which the agency should be permitted to apply its expertise to the litigant's claim or to correct its own mistakes prior to judicial review. *See id.* at 513–14, 515; *see also Bagues–Valles*, 779 F.2d at 484.

Additionally, requiring Rafeedie to complete the administrative process will not promote judicial economy. It is an enormous indulgence in wishful thinking to suppose that the INS will now suddenly reverse course and decide that section 235(c) is inapplicable to Rafeedie or that Rafeedie should not be excluded, thereby rendering the constitutional question moot. *See* Ct.Op. *supra*, at 515–16. Furthermore, Rafeedie's due process claim does not depend on the resolution of any factual questions, *cf. Dhangu*, 812 F.2d at 461; even if it

did, the summary section 235(c) proceeding would not provide a court with a meaningful factual record. *See* Ct.Op. *supra,* at 516–17.

While requiring exhaustion in this case would serve little, if any, purpose, it would cause considerable hardship to Rafeedie. First, as the opinion of the court recounts, the prospect of a section 235(c) proceeding, in which the government need not disclose the evidence underlying its substantive charges against Rafeedie, has chilled, and would continue to inhibit, Rafeedie's exercise of his first amendment rights of speech and association; Rafeedie understandably fears that his political activities in opposition to U.S. policies in the Middle East might increase the risk of exclusion. *See id.* at 517.[8] Second, Rafeedie would be caught between the horns of a difficult procedural dilemma. If he chose to present a factual defense in the 235(c) proceeding and a court were later to find that section inapplicable to him, the INS would know his defense before it brought charges against him in a subsequent section 236 proceeding. If he did not present a defense in the section 235(c) proceeding and a court subsequently upheld the application of that section to him, he would have irretrievably lost his only chance to defend against the charges. *See id.* at 517–18.[9] Last, but by no means least, Rafeedie would almost certainly be detained and deprived of his right to work in this country once he was excluded under section 235(c). *See id.* at 518. These deprivations, even

if they did not long endure, *see* Dissent *infra,* at 544 & n. 15, would be indisputably grievous.

Requiring exhaustion in this case, therefore, would provide at best only meager administrative and judicial benefits while threatening Rafeedie with grave and irreparable harm. For the reasons stated, assuming *arguendo* the applicability of section 106(c)'s exhaustion requirement to Rafeedie, I would hold relief from that requirement appropriate in the circumstances this case presents.

SILBERMAN, Circuit Judge, dissenting:

Washington, D.C. is the seat of the United States Government. It also has over 30,000 lawyers, a higher per capita percentage of lawyers than any other city in the United States—or, for that matter, the world. Not surprisingly, the federal courts in the District encounter an extraordinary number of cases that Congress meant to be brought at a different time in a different place. This is one such case.

I.

Like my colleagues, I find the government's basic position—that it may issue an exclusion order against a permanent resident alien "returning" to this country based on secret information in a summary

---

**8.** The dissent contends that Rafeedie's exercise of his first amendment rights will not be chilled because a habeas court will surely overturn an exclusion order founded on unconstitutional considerations. Dissent *infra,* at 543. It is no answer to a claim of a chilling effect that a court eventually will strike down the government's abuse of power, for, like an overbroad law, the threat of an unconstitutionally-motivated exclusion still " 'hangs over [people's] heads like a sword of Damocles.' That judges will ultimately rescue those whose conduct in retrospect is held protected is not enough, 'for the value of a sword of Damocles is that it hangs—not that it drops.' " L. Tribe, American Constitutional Law 1023 (2d ed.1988) (quoting *Arnett v. Kennedy,* 416 U.S. 134, 231, 94 S.Ct. 1633, 1682, 40 L.Ed. 2d 15 (Marshall, J., dissenting), *reh'g denied,* 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148 (1974)).

**9.** The dissent suggests that Rafeedie can escape this dilemma by not presenting a defense in the

summary proceeding, waiting until a habeas court finds section 235(c) unconstitutional as applied to him, and then presenting the defense in the subsequent section 236 proceeding. Dissent *infra,* at 544. The dissent's advice, however, assumes the outcome on the merits. That outcome, of course, would not be apparent to Rafeedie were we to dismiss this case without reaching the merits. The dissent concedes this alternate scenario: if a habeas court holds section 235(c) constitutional as applied, Rafeedie could not retrieve his right to present a defense in the summary proceeding. But the foregone rights, according to the dissent, would have scant value. *Id.* Slim though the right may be, it might be grasped tenaciously by one in Rafeedie's position if it were his *only* chance to be heard. Small chance becomes significant when no chance is the alternative.

proceeding under section 235 of the Immigration Act—to be profoundly troubling. Nevertheless, as I read the relevant provisions of the statute, the district court lacked jurisdiction to entertain the plaintiff's action under the Administrative Procedure Act.[1] Rafeedie, by Congress' command, is obliged to exhaust the administrative procedures available to him, whatever they may be. *See* 8 U.S.C. § 1105a(c) (1982). Thereafter, if the government issues an order excluding Rafeedie from entering the country, he may challenge the legality of that order only in a habeas corpus proceeding in the appropriate federal district court (presumably in the Sixth Circuit).

### A.

Although our jurisdiction *vel non* turns on the proper interpretation of section 106 of the Immigration Act, which includes an administrative exhaustion requirement (subsection 106(c)) and an exclusive procedure for judicial review (subsection 106(b)), it is necessary first to understand the nature and structure of "the particular administrative scheme at issue." *Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975).

Section 236 of the Immigration Act, 8 U.S.C. § 1226 (1982), entitled "Exclusion of Aliens—Proceedings," sets forth the normal "plenary" procedures the Attorney General must follow in excluding aliens. Section 235, 8 U.S.C. § 1225 (1982), entitled "Inspection by Immigration Officers—Powers of Officers," for the most part describes the Attorney General's authority to preliminarily detain and question entering aliens. Subsection 235(c), however, contains a blend of inspection and exclusion authority. It requires the INS's "special inquiry officer" to detain and order "temporarily excluded" *any* alien who appears "to be excludable under paragraphs (27), (28), or (29) of section 1182(a)...." *Id.* § 1225(c).[2] The same subsection authorizes the Attorney General, in the exercise of his discretion, in reliance on "confidential" information "and after consultation with the appropriate security agencies," to exclude and deport without any further inquiry any "temporarily excluded" alien whose entry would be prejudicial to the public interest, safety, or security of the country. *Id.* § 1225(c). Subsection 236(b) refers twice to this summary procedure under 235(c). Significantly, it is stated that "[e]xcept as provided in section [235(c)] of this title [a decision to exclude an alien] shall be rendered solely upon the evidence

---

1. Jurisdiction in the district court was apparently based on 28 U.S.C. § 1331 (1982), as well as on 8 U.S.C. § 1329 (1982), which provides:

 The district courts of the United States shall have jurisdiction of all causes, civil and criminal, arising under any of the provisions of this subchapter.

 The Administrative Procedure Act was thought to provide Rafeedie a cause of action.

2. Section 235(c) provides in relevant part:

 Any alien ... who may appear to the examining immigration officer or to the special inquiry officer during the examination before either of such officers to be excludable under paragraphs (27), (28), or (29) of section 1182(a) of this title shall be temporarily excluded, and no further inquiry by a special inquiry officer shall be conducted until after the case is reported to the Attorney General together with any such written statement and accompanying information, if any, as the alien or his representative may desire to submit in connection therewith and such an inquiry or further inquiry is directed by the Attorney General.

8 U.S.C. § 1225(c) (1982). Paragraphs (27), (28), and (29) of section 1182(a) provide, respectively, that the following classes of aliens are excludable from the United States: "[a]liens who ... seek to enter the United States ... to engage in activities which would be prejudicial to the public interest, or endanger [the nation's] welfare, safety, or security," *id.* § 1182(a)(27); "[a]liens who advocate or teach ... the unlawful assaulting or killing of any officer ... of any ... organized government ... or ... the unlawful ... destruction of property ... or ... sabotage," *id.* § 1182(a)(28)(F); and "[a]liens [who] ... would, after entry, engage in ... espionage, sabotage, public disorder, or in other activity subversive to the national security, [or] in any activity a purpose of which is the opposition to, ... or overthrow of, the Government of the United States, by force, violence, or other unconstitutional means." *Id.* § 1182(a)(29). Rafeedie was initially charged as excludable under all three of these provisions. When the INS shifted to summary proceedings, it amended the charging document to allege excludability only under §§ 1182(a)(27) and (a)(28)(F).

adduced before the special inquiry officer." *Id.* § 1226(b).

In this case, as the majority describes, the government initially sought to exclude Rafeedie under section 236 and then, in the midst of those proceedings, allegedly relying on recently obtained confidential information, switched to a section 235 summary proceeding. In this setting, Rafeedie was offered an opportunity to explain his activities when outside the country, but he was directed to do so without access to the information upon which the government was apparently prepared to rely in charging him as an excludable alien. Instead, he sued in federal district court in the District of Columbia to enjoin the INS from proceeding at all. As the majority puts it, "Rafeedie is in the unusual position of challenging a process not entirely before, and certainly not after, it has taken its course, but effectively in its midst." Maj. op. *supra*, at 524.

That course, in my view, was not open to Rafeedie, in part because subsection 106(c) of the Immigration Act unequivocally states:

> An order of deportation *or of exclusion* shall not be reviewed by *any* court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations....

8 U.S.C. § 1105a(c) (1982) (emphasis added). If that provision covers aliens in Rafeedie's position, there can be no question that the district court lacked jurisdiction. An explicit statutory exhaustion requirement is jurisdictional; it deprives federal courts of general federal question jurisdiction to entertain an ancillary action under the APA prior to exhaustion. *See Weinberger v. Salfi*, 422 U.S. 749, 766, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975); *see also Coit Indep. Joint Venture v. Fed'l Savings & Loan Ins. Corp.*, —— U.S. ——, 109 S.Ct. 1361, 1372, 103 L.Ed.2d 602 (1989). In other words, if subsection 106(c) applies to Rafeedie, it is not open to the court to engage in its balancing analysis, *see* Maj.

op. *supra*, at 513–19, to determine whether the harm to Rafeedie's interests in requiring him to submit to prescribed administrative procedures outweighs the general interest in delaying review until such procedures have been exhausted. For if subsection 106(c) applies, that is the end of the inquiry. *See Coit Indep. Joint Venture*, 109 S.Ct. at 1372. It is not even necessary, if subsection 106(c) applies, to consider which court might have jurisdiction to review an exclusion order issued *after* Rafeedie has exhausted the administrative procedures available to him. No matter which federal court ultimately has jurisdiction, no federal court has jurisdiction to intervene at this stage in the exclusion proceedings.

The majority concludes that it is "doubtful that Congress intended that § 106(c) ever apply to exclusion proceedings under section 235(c)." Maj. op. *supra*, at 511. But the plain language of subsection 106(c) draws no distinction between orders of exclusion issued under section 235 and those issued under section 236. Indeed, it applies broadly to "an order of deportation *or* of exclusion." 8 U.S.C. § 1105a(c) (1982). Nor is there a shred of legislative history to suggest that Congress meant something other than what it so clearly said in that section. The majority pays scant attention to subsection 106(c). Instead, the majority treats all of section 106 as an undifferentiated whole, concluding that subsection 106(c) is merely "derivative" of subsection 106(b) (a provision, to which I shall shortly turn, respecting habeas corpus review of exclusion orders). *See* Maj. op. *supra*, at 511. But whatever the proper interpretation of subsection 106(b), there can be no warrant for us to ignore the jurisdictional implications of an independent statutory exhaustion requirement whose plain terms cover Rafeedie.[3]

Rafeedie argues that Congress intended subsection 106(c) to provide no greater restraint on the timing of judicial review than traditional prudential exhaustion requirements, replete with the exceptions drawn for futility and so forth. *See, e.g., Atlan-*

---

**3.** I do not find the "apparently plain [statutory] language" the majority insists must be "over-

come" to conclude that the exhaustion requirement covers Rafeedie. *See* Maj. op. *supra*, at 512.

tic Richfield Co. v. Dep't of Energy, 769 F.2d 771, 782 (D.C.Cir.1984); see also NLRB v. Indus. Union of Marine and Shipbuilding Workers, 391 U.S. 418, 426 n. 8, 88 S.Ct. 1717, 1723 n. 8, 20 L.Ed.2d 706 (1968). This contention, on which the majority takes no position,[4] is drawn from a single passage in the House Report accompanying the 1961 amendments to the Immigration and Nationality Act ("INA") to the effect that subsection 106(c) "simply restates an established principle of judicial procedure." H.R. REP. No. 1086, 87th Cong., 1st Sess. 29 (1961), U.S.Code Cong. & Admin.News 1961, p. 2973 (hereinafter "House Report"). But Rafeedie's argument is premised on a faulty assumption: that Congress intended to codify a "principle of judicial procedure" does not mean Congress intended to codify the entire body of law on prudential exhaustion requirements, including the judicially-crafted exceptions. Weinberger v. Salfi suggests precisely the opposite: when Congress incorporates an administrative exhaustion requirement into a statutory scheme, satisfaction of the exhaustion requirement is a prerequisite to judicial review. 422 U.S. at 766, 95 S.Ct. at 2467. "The requirement is ... something more than simply a codification of the judicially developed doctrine of exhaustion, and may not be dispensed with merely by a judicial conclusion of futility...." Id.[5] The Supreme Court's most recent restatement of this principle leaves no doubt that "exhaustion of administrative remedies is required where Congress imposes an exhaustion requirement by statute." Coit Indep. Joint Venture, 109 S.Ct. at 1372 (emphasis added).

It is true, as the concurrence argues, see Concurrence supra, at 526–28, that the Supreme Court has subsequently concluded that a significant portion of the implied exhaustion requirement at issue in Salfi may be excused by courts in certain circumstances. See, e.g., Bowen v. City of New York, 476 U.S. 467, 483, 106 S.Ct. 2022, 2031, 90 L.Ed.2d 462 (1986); Mathews v. Eldridge, 424 U.S. 319, 330–32, 96 S.Ct. 893, 900–01, 47 L.Ed.2d 18 (1976). But this is due to the structure of the Social Security Act provision there under review, and does not detract from the principle announced in Salfi that when Congress makes exhaustion a jurisdictional prerequisite, the requirement cannot be done away with, for example, "by a judicial conclusion of futility." Salfi, 422 U.S. at 766, 95 S.Ct. at 2467. Section 405(g) of the Social Security Act, the provision examined in Salfi, does not explicitly require submission to all available administrative procedures; it simply makes available judicial review to a claimant "after any final decision of the Secretary made after a hearing to which he was a party...." 42 U.S.C. § 405(g) (1982 & Supp. IV 1986). (Another provision in the Social Security Act makes the section 405(g) procedures the exclusive means of judicial review of benefit determinations. See 42 U.S.C. § 405(h) (1982 & Supp. IV 1986).) It was this statutory prerequisite of a "final decision" that the Court found impliedly to require exhaustion of administrative remedies. Yet the statute does not itself define the administrative procedures applicable to claims for benefits; instead, it leaves their definition to the Secretary of Health and Human Services. One year after Salfi, in Mathews v. Eldridge, the Court reasoned that Congress, because it had not specified mandatory administrative procedures for claimants to follow, did not intend to leave the contours of "finality" to the unfettered discretion of the Secretary. See Eldridge, 424 U.S. at 330, 96 S.Ct. at 900. The Court therefore concluded that the judiciary could, on rare occasions, excuse

---

**4.** As the majority notes, see Maj. op. supra, at 511, there is a split in the circuits on this question.

**5.** When Congress intends that exceptions to statutory exhaustion be available, it expressly incorporates those exceptions in the substantive statute involved. See, e.g., 15 U.S.C. § 717r(b) (1982) (Natural Gas Act) ("[n]o objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do."); 16 U.S.C. § 825l(b) (1982) (Federal Power Act) (same).

full compliance with certain of the procedures established by the Secretary's regulations.[6]

The Immigration Act, in sharp contrast, expressly creates administrative machinery for determining the status of entering aliens, *see* 8 U.S.C. §§ 1225(c), 1226 (1982), and by its terms directs exhaustion by individual aliens. Congress has specified certain procedural minima in the Act, which the Commissioner of the INS (unlike the Secretary of Health and Human Services with respect to the Social Security Act) has no apparent discretion to eliminate. No inference can thus be drawn from either the plain language of the Immigration Act or its legislative history that the courts—or, for that matter, even the *Commissioner*—may ignore the statutorily created jurisdictional prerequisite of exhaustion of administrative remedies made available by the statute. Congress has unambiguously codified the required procedures and unambiguously mandated their exhaustion. Although the issue confronting the court is not, as the concurrence notes, " 'Jurisdiction' writ large" (in the constitutional sense), *see* Concurrence *supra*, at 529; *see also United States v. Kember*, 648 F.2d 1354, 1358–59 (D.C.Cir.1980), it does concern jurisdiction writ *statutory*. Statutory jurisdictional questions cannot be dispensed with merely by invoking prudential principles. If Congress has directed in unmistakable terms that federal courts withhold the exercise of jurisdiction until the prospective plaintiff has satisfied certain conditions, we have no power to redact this command. *See, e.g., I.A.M. Nat'l Pension Fund v. Stockton Tri Indus.*, 727 F.2d 1204, 1208 & n. 11 (D.C.Cir.1984) (suggesting that "clear congressional statement" that courts may not hear a case until agency comes to a· final decision constitutes "absolute" jurisdictional bar until condition is satisfied).

## B.

Subsection 106(b), in my view, presents another jurisdictional barrier to Rafeedie's action. It states:

Notwithstanding the provisions of any other law, *any* alien against whom a final order of exclusion has been made heretofore or hereafter under the provisions of section [236] or comparable provisions of any prior Act may obtain judicial review of such order by habeas corpus proceedings *and not otherwise.*

8 U.S.C. § 1105a(b) (1982) (emphasis added). Thus, even if Rafeedie is for some reason excused from exhausting administrative remedies, he is in the wrong court.

To be sure, by mentioning within the body of subsection 106(b) only section 236 exclusion orders and omitting any reference to exclusion orders entered under section 235, Congress created an ambiguity as to whether it intended section 235 exclusion orders to be unreviewable altogether, reviewable in any "court of competent jurisdiction" under the APA, 5 U.S.C. § 703 (1982), or reviewable in the same manner as section 236 exclusion orders. The government contends that although Congress may well have intended there to be *no* review of summary exclusion orders, it could not possibly have meant the most dangerous categories of excludable aliens to have greater review rights than other aliens excludable under section 236. Rafeedie—this time relying on the actual language of the statute—argues, on the other hand, that since subsection 106(b) does not explicitly confine review of section 235 exclusion orders under the APA to the "special statutory review proceeding" of habeas corpus, *id.*, the district court has jurisdiction to issue declaratory and injunctive relief now. The majority tentatively agrees with Rafeedie, relying on Supreme Court cases holding that a cause of action under the APA to challenge agency action lies unless a statute precludes such judicial re-

---

**6.** At the same time, the Supreme Court has repeatedly emphasized that the Social Security Act embodies an absolute jurisdictional prerequisite—that a claim for benefits must have been filed with the Secretary prior to instituting litigation. *See Salfi,* 422 U.S. at 766–67, 95 S.Ct. at 2467; *see also City of New York,* 476 U.S. at 482–83, 106 S.Ct. at 2031–32; *Eldridge,* 424 U.S. at 328, 96 S.Ct. at 899. The logic of the concurring opinion would compel the conclusion that even this part of the Social Security Act's implicit exhaustion mandate is not "absolute."

view by "clear and convincing evidence." Maj. op. *supra,* at 511. I do not.

Although the statute could be read to preclude judicial review of summary exclusion orders under section 235 altogether, I think the better reading is that which the government prefers—that subsection 106(b) applies to *both* section 235 and section 236 exclusion orders. As I noted at the outset, subsection 235(c) seems misplaced; although it deals with exclusion orders, it was not put in the section entitled "Exclusion of Aliens—Proceedings" (section 236) but rather at the end of the immediately preceding section entitled "Inspection by Immigration Officers—Powers of Officers." Yet subsection 236(b) twice cross-references subsection 235(c) in a manner suggesting that section 236 would, but for the cross-references, apply to subsection 235(c). Therefore, there is substantial support to reject what is perhaps the most obvious interpretation of these provisions of the INA—that Congress intended no judicial review of section 235 exclusion orders at all. Apart from these textual references, were section 235 orders intended by Congress to be completely unreviewable, we would be presented with grave constitutional issues insofar as the application of that section to aliens who could claim due process rights (such as permanent residents) was concerned. *See Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 2053, 100 L.Ed.2d 632 (1988). It is our obligation, of course, to construe statutes—given legitimate ambiguities—so as to avoid constitutional questions. *See Heckler v. Mathews,* 465 U.S. 728, 741–44, 104 S.Ct. 1387, 1396–97, 79 L.Ed.2d 646 (1984); *Johnson v. Robison,* 415 U.S. 361, 366–67, 94 S.Ct. 1160, 1165–66, 39 L.Ed.2d 389 (1974). *But cf. United States v. Locke,* 471 U.S. 84, 96, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64 (1985) ("We cannot press statutory construction 'to the point of disingenuous evasion' even to avoid a constitutional question.") (quoting *Moore Ice Cream Co. v. Rose,* 289 U.S. 373, 379, 53 S.Ct. 620, 622, 77 L.Ed. 1265 (1933)).

Agreeing with my colleagues that it is appropriate to conclude that Congress intended there to be *some* judicial review of summary exclusion orders, I nevertheless find it impossible to ascribe to Congress an intent to permit the aliens whom Congress regarded as the least deserving of entry to have full recourse under the APA to challenge actions (or even threatened actions) that no other allegedly excludable aliens would enjoy in the context of section 236 exclusion proceedings. No "talismanic" incantation like "clear and convincing evidence" can justify such an obvious frustration of congressional purpose. *Lindahl v. Office of Personnel Mngt.,* 470 U.S. 768, 778, 105 S.Ct. 1620, 1626, 84 L.Ed.2d 674 (1985). The Supreme Court has recently made quite clear that a congressional intent to prohibit *any* judicial review under the APA for a class of litigants can and should be drawn from the structure of the statute:

> Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> In the context of preclusion analysis, the "clear and convincing evidence" standard is *not a rigid evidentiary test* but a useful reminder to courts that, where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling.

*Block v. Community Nutrition Inst.,* 467 U.S. 340, 345, 351, 104 S.Ct. 2450, 2453–54, 2456–57, 81 L.Ed.2d 270 (1984) (emphasis added). Here the question is not whether Rafeedie is subject to exclusion from the United States without judicial review; it is merely whether he can avoid the habeas procedure—in APA terms, "the special statutory review proceeding ... specified by statute," 5 U.S.C. § 703 (1982)—that Congress deliberately prescribed for aliens challenging exclusion orders. It thus follows *a fortiori* from *Block* that we cannot confine our analysis of the statute to a search for a clear statement by Congress that judicial review is limited to a specific

proceeding. Viewed in context, I do not think subsection 106(b) can reasonably be construed to permit Rafeedie's circumvention of the habeas procedure.

The majority appears to acknowledge the weakness of Rafeedie's proffered construction of subsection 106(b). *See* Maj. op. *supra,* at 512. So rather than resting its jurisdictional holding exclusively on such an anomalous interpretation of subsection 106(b), it also relies on an alternative interpretation of section 106—not argued or even suggested by any party—that the bulk of section 106 of the Immigration and Nationality Act does not apply to permanent resident aliens. I hardly know where to begin, for the majority's position, if I understand it correctly, has enormous consequences.[7]

First, an appellate procedural concern. This court has held time and time again that we will not entertain an argument not properly put forth by a party to an appeal. "The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983); *see also Alabama Power Co. v. Gorsuch,* 672 F.2d 1, 7 n. 34 (D.C.Cir.1982) (collecting cases). We have even suggested that it is proper to decline to reach an argument raised for the first time in an appellant's reply brief. *See Reyes-Arias v. INS,* 866 F.2d 500, 504 n. 2 (D.C.Cir.1989). It follows that the court itself may not—must not—rely on an entire argument not briefed or alluded to at all by the parties.

Often, it must be acknowledged, the court's ultimate treatment of an argument it accepts may differ in analysis from the manner in which it was presented by a party. That, however, is not this case; the principal argument upon which the majori-

ty rests its holding regarding the district court's subject matter jurisdiction was not even hinted at by Rafeedie or, for that matter, *amici.* While Rafeedie did argue, as the majority notes, *see* Maj. op. *supra,* at 513, both that subsections 106(b) and (c) do not apply to summary exclusion proceedings and that permanent resident aliens cannot lawfully be subjected to such summary proceedings, he never suggested that the subsection 106(b) habeas procedure and the subsection 106(c) exhaustion requirement do not cover permanent residents.

The Supreme Court has often stated that a court is obliged to reach questions of subject matter jurisdiction *sua sponte,* and may undertake review of the merits of a dispute only if the court is satisfied such jurisdiction exists. *See, e.g., Liberty Mut. Ins. Co. v. Wetzel,* 424 U.S. 737, 740, 96 S.Ct. 1202, 1204, 47 L.Ed.2d 435 (1976); *see also Denton v. Merit Systems Protection Bd.,* 768 F.2d 422, 423 (D.C.Cir.1985). But I find it exceedingly troubling that the majority rests an *affirmative* finding of subject matter jurisdiction on a basis not even remotely suggested to the court by either party, without at least offering the parties an opportunity—as we traditionally do—to submit supplemental briefs on the question. *See, e.g., Athens Community Hosp., Inc. v. Schweiker,* 686 F.2d 989, 992 (D.C. Cir.1982); *Amusement and Music Operators Ass'n v. Copyright Royalty Tribunal,* 636 F.2d 531, 533 n. 2 (D.C.Cir.1980). It is especially unfair to the government in this instance, since it is Rafeedie who bears the burden of demonstrating that subject matter jurisdiction exists in this action. *See, e.g., McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Georgiades v. Martin-Trigona,* 729 F.2d 831, 833 n. 4 (D.C.Cir.1984).

---

7. The majority insists that it does not reach the question of the applicability of §§ 106(b) and (c) to permanent residents. Maj. op. *supra,* at 512, 513. But the "wrinkle" on which it relies to support its rejection of the "strong argument from anomaly"—respecting the extension of a fuller complement of judicial review rights to those aliens least deserving of entry—is that Rafeedie is a permanent resident alien, and that

this fact somehow has jurisdictional consequences under § 106. (Whether this makes a difference insofar as the applicability of § 235(c) is concerned is a "merits" question that has no bearing on our jurisdictional inquiry.) Without the § 106 argument, the majority's analysis runs against the "argument from anomaly" it purports to find so strong.

Turning to the substance of the question, the principle underlying the majority's suggestion—that subsections 106(b) and (c) *do not apply* to permanent resident aliens— seems plainly at odds with the language of the statute, is contrary to an explicit Supreme Court assumption as well as other judicial acknowledgments, and promises great confusion in the administration of the Act. As the majority recognizes, *see* Maj. op. *supra,* at 510–11, when Congress amended the judicial review provisions of the Immigration and Nationality Act and added section 106 to title 8 of the Code, it explicitly stated that it was "implement[ing] and apply[ing]" section 703 of the APA by "creat[ing] a single, separate, statutory form of judicial review of administrative orders for the deportation and exclusion of aliens." House Report at 22, U.S.Code Cong. & Admin.News 1961, p. 2966. The language of section 106 applies by its terms, moreover, to *all* aliens; there is no distinction drawn between those who are permanent residents and those who are not. As the government notes, when Congress has determined to make available unique protections to permanent resident aliens, it has done so expressly. *See* 8 U.S.C. § 1182(a)(25) (1982) (exempting aliens "lawfully admitted for permanent residence" from exclusion on grounds of illiteracy); *id.* § 1182(c) (exempting returning permanent residents, under certain conditions, from most of the substantive grounds of excludability set forth in 8 U.S. C. § 1182(a)).

The majority's tentative construction of subsections 106(b) and (c), moreover, has unfortunate side effects, for it upsets Congress' carefully crafted scheme for judicial review of deportation orders as well. Subsection 106(c) requires aliens to exhaust administrative remedies prior to obtaining review of both exclusion *and* deportation orders. *See* 8 U.S.C. § 1105a(c) (1982). If the majority believes that subsection 106(c) does not apply to permanent resident aliens, that would mean that permanent resident aliens, unlike other aliens, are *not*

obliged to exhaust administrative remedies before seeking review of deportation orders in the courts of appeals under section 106(a). Although the courts that have addressed this latter question have done so only obliquely, they have rejected that interpretation. *See Sotelo Mondragon v. Ilchert,* 653 F.2d 1254, 1255 (9th Cir.1980); *Hernandez–Almanza v. Dep't of Justice,* 547 F.2d 100, 103 (9th Cir.1976). In any event, the logic of the majority's suggestion—that subsections 106(b) and (c) were meant to apply only to aliens who do not possess constitutional rights—would seem equally applicable to subsection 106(a), a provision which limits APA review for aliens in a manner similar to subsection 106(b) by erecting exclusive procedures for judicial review of deportation orders in the courts of appeals. At the very least, it is incumbent upon the majority to explain how and why Congress would have used the term "alien" in all three subsections of section 106 with an entirely different understanding of the word's meaning in the latter two subsections than it had in mind in drafting the first.

The Supreme Court has certainly never suggested that the judicial review provisions embodied in section 106—including subsection 106(b)'s prescription of habeas corpus—were not meant to cover permanent resident aliens. Indeed, only recently in *Landon v. Plasencia,* the Court stated otherwise: "an alien can challenge an exclusion order only by a petition for writ of habeas corpus." 459 U.S. 21, 26, 103 S.Ct. 321, 326, 74 L.Ed.2d 21 (1982). Plasencia was, in fact, a permanent resident alien. She claimed, unsuccessfully, that upon her return to the country after a brief trip to Mexico, the INS could not proceed against her in an exclusion hearing but rather only in a deportation proceeding. She did not claim, to be sure, that the judicial review provisions of subsections 106(b) and (c) did not apply to permanent resident aliens; instead, she wished the added protections of deportation proceedings as against those provided in exclusion proceedings.[8] Never-

---

**8.** The INA extends aliens against whom orders of deportation have been entered pursuant to

deportation proceedings a number of rights not extended to aliens excluded under §§ 235 or

theless, on petition for writ of habeas corpus, the Supreme Court rejected her argument, one quite similar to that which the majority accepts here, and held that permanent resident aliens, *like other aliens*, are subject to exclusion proceedings when seeking reentry into the United States:

> The language and history of the Act [ ] clearly reflect a congressional intent that, whether or not the alien is a permanent resident, admissibility shall be determined in an exclusion hearing. Nothing in the statutory language or the legislative history suggests that the respondent's status as a permanent resident entitles her to a suspension of the exclusion hearing or requires the INS to proceed only through a deportation hearing.

*Plasencia,* 459 U.S. at 28, 103 S.Ct. at 326–27. Although that case dealt with the appropriate administrative procedure to be applied to a returning permanent resident alien (i.e., deportation or exclusion proceedings), the Court's rationale for refusing to draw a categorical distinction between permanent resident aliens and other aliens in order to determine the propriety of exclusion proceedings seems applicable here. And the Court expressly assumed that which the majority disputes, that a habeas corpus proceeding is the exclusive means of gaining judicial review of an exclusion order under the Immigration Act.[9]

Several courts of appeals have come even closer to a direct holding that permanent resident aliens—like other aliens—may seek judicial review of an exclusion order solely through habeas. For instance, the Fifth Circuit, in *Delgado–Carrera v. INS,* 773 F.2d 629 (5th Cir.1985), seemed to echo *Plasencia* when it flatly stated that "a resident alien who goes abroad and returns is differently situated from one whose residency is uninterrupted. Any appeal from an exclusion proceeding, *even one that challenges the appropriateness or due*

*process of that proceeding,* can only be brought by a habeas corpus petition to the district court." *Id.* at 632 (emphasis added). *See also Maldonado–Sandoval v. INS,* 518 F.2d 278, 280 n. 3 (9th Cir.1975) ("No matter how long [the alien] may have resided [in the United States] before his brief departure or how deserving his case may be, the alien ..., [i]f ordered excluded, ... [may obtain] judicial review ... 'by habeas corpus proceedings and not otherwise.'"); *Hernandez–Almanza,* 547 F.2d at 103 (subsection 106(c) precluded claim of permanent resident alien who had failed to exhaust administrative remedies); *Sotelo Mondragon,* 653 F.2d at 1255 (same). That no court has squarely held on the point, I dare say, is a reflection of the argument's tenuous basis; it has apparently never even been presented.

The majority reasons from the proposition that Congress never meant to apply subsections 106(b) and (c) to aliens who have constitutional rights of due process. The majority's suggestion is not, it should be noted, based on the notion that either the exhaustion requirement or habeas corpus review is constitutionally infirm, i.e., that somehow either of those sections, because of their operation, unconstitutionally impairs the protection of constitutional rights. Rather, it is that the image of an alien Congress had in mind when drafting subsection 106(b) was of a person who had no constitutional right to any process at all when seeking admission. Therefore, subsections 106(b) and (c) (and perhaps subsection 106(a)) do not apply to permanent resident aliens because they manifestly *do* have constitutional rights, rights which the Supreme Court had recognized prior to Congress' enactment of section 106. *See Kwong Hai Chew v. Colding,* 344 U.S. 590, 596, 73 S.Ct. 472, 477, 97 L.Ed. 576 (1953).

This deduction, which appears to be the core of the majority's jurisdictional analy-

---

236. Not only may such aliens be able to depart voluntarily to a country of their own choosing (subject to some restrictions), *see* 8 U.S.C. §§ 1253(a), 1254(e) (1982), but they are also entitled to seek suspension of their deportation. *Id.* § 1252(e). *See generally Plasencia,* 459 U.S. at 26, 103 S.Ct. at 325.

9. Interestingly, the only federal case in which the question of whether permanent resident aliens may be excluded without due process, *United States ex rel. Kasel de Pagliera v. Savoretti,* 139 F.Supp. 143 (S.D.Fla.1956), arose in habeas corpus. *See id.* at 145.

sis, is based on only a fragment of legislative history:

> Such a restriction to habeas corpus does not deprive the alien of any constitutional rights. It is well settled that aliens seeking admission to the United States cannot demand that their application for entry be determined in a particular manner or by use of a particular type of proceedings. *For those aliens, the procedure fixed by Congress is deemed to be due process of law.* (*Knauff v. Shaughnessy*, 338 U.S. 537 [70 S.Ct. 309, 94 L.Ed. 317] (1950)).

Maj. op. at 512 (quoting House Report at 32) (emphasis added by majority). There is nothing particularly relevant in the first two sentences. It is not suggested, nor could it be, that habeas corpus itself is constitutionally inadequate; the report itself recognizes that no alien, not even a permanent resident alien who is concededly entitled to constitutional protection, may demand that her immigration rights be determined in a particular proceeding. *See also Plasencia*, 459 U.S. at 31–32, 103 S.Ct. at 328–29. And Congress understood habeas corpus and declaratory judgment proceedings to offer the same scope of review. House Report at 32. It is upon the last sentence that the majority fixes its attention. That sentence is admittedly ambiguous. The majority takes it to imply that the aliens covered by this statute are only those who lack constitutional rights, and, as such, the procedure fixed by Congress is all the process that is due;[10] it may be, however, that Congress misunderstood (or disagreed with) prior Supreme Court cases. (On occasion even the judiciary itself seems to misunderstand Supreme Court cases.) Be that as it may, it is not open to the court, in my view, to prefer an ambiguous sentence in a House Report not squarely on point to the plain language of the statute. *See, e.g., Burlington Northern R.R. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461, 107 S.Ct. 1855, 1859, 95 L.Ed.2d 404 (1987).

The majority's presumptive construction of section 106, moreover, hardly fits with the rest of the immigration statute. There is no question that Congress authorized the Attorney General to use exclusion procedures under section 236 against permanent resident aliens. *See Plasencia*, 459 U.S. at 27–28, 103 S.Ct. at 326–27. The majority presumes, however, that when Congress fashioned the *judicial review* provisions that would apply, *inter alia*, to exclusion orders, it determined to omit coverage of exclusion orders that were directed against permanent resident aliens, leaving the nature of those judicial review proceedings to be developed piecemeal by the judiciary under the APA. In the face of Congress' express purpose to "occupy the field," this approach is—in my view—a virtually inconceivable appraisal of congressional intent.

The majority's analysis, relying as it does on the notion that returning resident aliens with constitutional rights to due process are not bound by the strict judicial review procedures of section 106, introduces grave (and unnecessary) uncertainty into a relatively settled field of law governing review of deportation and exclusion orders. The majority speaks of aliens with constitutional rights as if they wear a telltale emblem readily confirming their entitlement to due process, but, alas, this is not the case. While the Supreme Court has held that a continuously present resident alien is entitled to due process in deportation proceedings, *see, e.g., United States ex rel. Tisi v. Tod*, 264 U.S. 131, 133–34, 44 S.Ct. 260, 260–61, 68 L.Ed. 590 (1924), and that a returning resident alien in some circumstances is similarly entitled to due process in exclusion proceedings, *compare Kwong Hai Chew*, 344 U.S. at 596, 73 S.Ct. at 477, *with Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 214–15, 73 S.Ct. 625, 630, 97 L.Ed. 956 (1953), it is far from clear where the lines of "assimilation" to the status of one with constitutional rights are drawn in other settings. Not only may an extended absence from our shores draw

---

**10.** The paragraph can in no event be ascribed significance in the interpretation of § 106 generally; it is contained in the portion of the House Report discussing the operation of § 106(b). Thus, even if the paragraph is given the majority's interpretation, § 106(c)'s exhaustion requirement would remain applicable to permanent residents.

540

the constitutionally protected status of a *returning* resident alien into question, *see id.,* the status of a *continuously present* resident alien may likewise be the subject of heated debate. *See, e.g., Bae v. INS,* 706 F.2d 866 (8th Cir.1983) (alien challenging withdrawal of permanent resident status in review of deportation order); *Jacobe v. INS,* 578 F.2d 42 (3d Cir.1978) (alien challenging cancellation of "permanent immigration visa" in review of deportation order).

Which court—the federal district court in which a habeas petition would be lodged or any district court of "competent jurisdiction"—would have jurisdiction, it might be asked, if the alien's constitutional status were in dispute? And at what stage of the relevant administrative proceedings? Under the majority's provisional view, it is impossible to resist the conclusion that all aliens subject to deportation or exclusion would be entitled to proceed to district court (without exhausting administrative remedies) for a declaration on the threshold question of their status. This strikes me as a rather peculiar way—to say the least—for Congress to draw jurisdictional lines for federal courts. The complexities seem endless. Even had Congress not manifested an intention, when passing section 106, to "create a *single, separate,* statutory form of judicial review of administrative orders for the deportation and exclusion of aliens," House Report at 22, U.S.Code Cong. & Admin.News 1961, p. 2966 (emphasis added), that result would be anomalous.

Nevertheless, the majority believes that its supposition that permanent resident aliens are not obliged to seek review of an exclusion order only through habeas corpus proceedings is authorized in part because there is "some question" as to whether Congress intended subsections 106(b) and (c) to apply to that class of aliens; thus, plenary APA review of exclusion orders likely remains available. As I have indicated, I think the evidence to support the proposition resisted by the majority is more than clear and convincing; I think, even if it were appropriate to use the evidentiary model, the applicability of section 106 is manifest beyond a reasonable doubt, and

the case upon which the majority seems to rely, *Rusk v. Cort,* 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962), is inadequate support for the majority's conclusion.

In *Cort,* the Supreme Court held, under a provision of the Immigration Act not at issue here, that an American physician who allegedly left the country to avoid the draft during the Korean war was entitled to seek a judicial declaration that the Passport Office had incorrectly determined that he had lost his citizenship and was thus not entitled to a passport. The 1952 Immigration Act provided a method by which a person abroad claiming citizenship could seek a certificate of identity which, if granted, allowed the person to come to the United States. If the Attorney General determined that such a person was not entitled to admission, the person could seek review of that exclusion "by habeas corpus and not otherwise." *Cort,* 369 U.S. at 374, 82 S.Ct. at 791. The Court held that the exclusive habeas provision applied only to persons who utilized the specific procedure involving presentation at the border—a procedure that was permissive, not mandatory—and since Cort had not so elected, he could file for a declaratory judgment. Congress had erected the former procedure, according to the statute's legislative history, *not* to force those living abroad who claimed citizenship to travel to the United States to make their claim, but rather only to ensure that those who in fact made citizenship claims when seeking entry at the border were able to obtain review of denials of these claims "in habeas corpus proceedings and not otherwise." 8 U.S.C. § 1503(c) (1982).

The Supreme Court admittedly seemed to permit its understanding of the exclusivity *vel non* of the habeas provision to be influenced by Cort's plight, but the latter was understandable *in jurisdictional terms.* If the government's construction of that statute had prevailed, Cort would have been obliged to travel to the United States, be detained, and only then challenge the legality of the State Department's determination that he had lost his citizenship. Since all he wished was an American pass-

port, not re-entry into the United States,[11] the government's interpretation would have required travel to the United States as part of a *de facto* exhaustion requirement, which would be quite strange. That was particularly so because the section of the Immigration Act before the Court in that case did not itself contain any exhaustion requirement—like subsection 106(c)—to which habeas corpus review was appended. *See* 8 U.S.C. § 1503(b) & (c) (1982). According to the Supreme Court, Congress' elimination several years earlier of a provision entitling aliens to declaratory judgments was designed simply to prevent persons traveling to the United States from making spurious citizenship claims to forestall their exclusion—exactly what Cort did not do. (Congress repealed this declaratory judgment provision with the understanding that the provision was *merely* a codification of existing law. 369 U.S. at 377, 82 S.Ct. at 793.) In *Rusk v. Cort,* in contrast to this case, it thus could fairly be said that Congress did not intend to relegate those in Cort's position to habeas corpus proceedings. Whatever the proper interpretation of *Rusk v. Cort,* moreover, the Supreme Court, as noted earlier, has recently indicated that the "clear and convincing" standard by which judicial review for a class of persons may be completely precluded is more easily satisfied than the majority believes is implied by that earlier case. *See Block v. Community Nutrition Inst.,* 467 U.S. at 351, 104 S.Ct. at 2456.

The majority appears sorely troubled, as am I, by the prospect of section 235 summary proceedings being employed against a permanent resident alien who, it may be assumed, enjoys protection under the Constitution.[12] But the question of whether subsection 235(c) may lawfully be applied to Rafeedie—as compared to the threshold jurisdictional issue—goes to the merits of Rafeedie's claim, and Rafeedie is fully entitled to raise that issue in a habeas corpus proceeding. Whether or not Congress ex-

plicitly envisioned subsection 235(c) as being available to INS to be used against a permanent resident alien with constitutional rights, we have no warrant to hold that the exhaustion requirement of subsection 106(c) and the statutory review proceeding in subsection 106(b) simply disappear when we are faced with an ancillary action by a permanent resident alien.

The majority repeatedly emphasizes, *see* Maj. op. *supra,* at 512, 513, that it does not "hold" that subsections 106(b) and (c) do not apply to permanent resident aliens. Instead, it suggests merely that "there is a reasonable question." *Id.* at 512. If this is so, I am unable to identify the principles underlying the majority's holding. The majority does not embrace warmly the argument Rafeedie presses so strongly—that subsections 106(b) and ("derivatively") 106(c) do not encompass summary exclusion proceedings—in part because of the "argument from anomaly" I find persuasive. Without the analysis concerning the applicability of subsections 106(b) and (c) to permanent residents, therefore, the majority's holding rests exclusively—and precariously—on the force of Rafeedie's position on the merits of the dispute, e.g., whether subsection 235(c) may constitutionally be applied to him. I do not think it proper to permit the strength of Rafeedie's case on the merits (or the unpalatability of the government's merits position) to drive the court's jurisdictional analysis. That the *government* has singled out Rafeedie to test the improbable proposition that a permanent resident alien in Rafeedie's position can be barred from reentering our country without due process of law does not license the *court* to single out this case for special jurisdictional treatment not authorized by Congress.

By lapsing, in essence, into analysis of "the totality of the circumstances"—by resting its jurisdictional holding on a series

---

**11.** He would have faced an indictment for draft evasion in this country. *See Cort,* 369 U.S. at 369, 82 S.Ct. at 788.

**12.** The government's argument that a permanent resident alien loses his constitutional pro-

tection simply when he leaves the country for a nefarious purpose seems difficult to accept; but, in my view, it is inappropriate to reach that issue.

of propositions no one of which alone permits the result obtained—the majority invites future *ad hoc* jurisdictional determinations under the Immigration Act. The majority's failure to provide a "firm rule of decision" in its opinion sacrifices the important interests of uniformity and predictability in service of the unattainable goal of "perfection" in the exercise of judicial power. *See* A. Scalia, "The Rule of Law as a Law of Rules," Oliver Wendell Holmes Bicentennial Lecture, Harvard Law School (Feb. 14, 1989) (to be published in 56 U. Chi.L.Rev.). Although the effect of the majority's analysis—so carefully limited—may only be to issue Rafeedie "a restricted railroad ticket, good for this day and train only," *Smith v. Allwright*, 321 U.S. 649, 669, 64 S.Ct. 757, 768, 88 L.Ed. 987 (1944) (Roberts, J., dissenting), this sort of opinion in the long run has dangerous if subtle consequences for the development of the law.

In sum, I do not believe the statute, its legislative history, or any case law justifies the majority's jurisdictional analysis. Since I believe the district court lacked jurisdiction because of the independent operation of subsections 106(b) and (c), it is not necessary for me to entertain Rafeedie's claim that his remedies under subsections 106(b) and (c) are in some sense "inadequate" and, therefore, under *McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), this court should, as a matter of prudence, permit him to escape those provisions. I do so, nevertheless, because I disagree with the majority's treatment of that question as well.

## II.

Having determined that subsections 106(b) and (c) do not even apply to Rafeed-

ie, a permanent resident alien, the majority labors long and hard at prudential exhaustion analysis. Yet if Congress never intended subsection 106(c)'s exhaustion requirement or subsection 106(b)'s exclusive habeas procedure to apply to permanent resident aliens, I doubt whether it is open to the court to impose one or the other on Rafeedie on "prudential" grounds. To do so, under the majority's interpretation of the statute, would seem directly contrary to congressional intent.[13] Rafeedie, on the other hand, argues that subsections 106(b) and (c) permit declaratory actions in circumstances where administrative remedies are inadequate. The majority rejects Rafeedie's implicit premise, that section 106 applies to him, and takes no position on his explicit assumption that its strictures can be avoided by a claim of inadequate administrative remedies, but, paradoxically, extensively analyzes the adequacy of his administrative remedies. Whatever the foundation for its analysis, I think the majority incorrect in concluding those remedies are legally inadequate. And I believe habeas corpus provides Rafeedie an opportunity for complete relief for any defect, constitutional or otherwise, that develops in the administrative proceedings.

First, in my view, it is not at all certain that, assuming Rafeedie is constitutionally entitled to due process, the government will fail to supply it. Of course, as the majority points out, by bringing section 235 proceedings against Rafeedie at all, the government has determined that it may lawfully proceed against Rafeedie under this section. The majority reasons from that common-sense observation that Rafeedie cannot be given the process that is constitutionally due him in the context of section 235 proceedings, because the

13. *Salfi* holds that when Congress makes exhaustion a "jurisdictional prerequisite," it "may not be dispensed with merely by a judicial conclusion of futility." *Salfi*, 422 U.S. at 766, 95 S.Ct. at 2467. In the absence of a congressional statement as to exhaustion of administrative remedies, the balancing analysis set forth in *McKart*, 395 U.S. at 197, 89 S.Ct. at 1664, governs whether prudential exhaustion—or its "numerous exceptions"—will be applied to "the particular administrative scheme involved." *Id.* at 193, 89 S.Ct. at 1662. Where Congress consciously declines to impose a statutory exhaustion requirement on a discrete class of litigants, as the majority's interpretation of the Immigration Act suggests, it seems inconsistent with congressional intent for courts nevertheless to impose an exhaustion requirement of their own making on those litigants. *Cf. Salfi*, 422 U.S. at 766–67, 95 S.Ct. at 2467–68 (highlighting relevance of congressional intent to analysis of exhaustion requirements).

government is not authorized to conclude that subsection 235(c) is unconstitutional as applied to a permanent resident alien. I think the majority's reasoning is faulty. The government has already granted Rafeedie more process under subsection 235(c) than its provisions require. In the face of the constitutional argument Rafeedie presents to this court—*but did not present to the INS*—I see absolutely no bar to the government's deciding that he is, indeed, entitled to more extensive procedural protections, even in a summary proceeding, than he has been offered to date. *Cf. Plasencia*, 459 U.S. at 34–37, 103 S.Ct. at 330–32; *Kwong Hai Chew*, 344 U.S. at 601–02, 73 S.Ct. at 480. I would think the Attorney General has an obligation to provide Rafeedie that process which the Attorney General believes the Constitution requires. *Cf. Meredith Corp. v. FCC*, 809 F.2d 863, 872 (D.C.Cir.1987) (agency has obligation to address constitutional challenge to enforcement proceeding). In a closely related context, Congress has specifically required the Attorney General to undertake a preliminary assessment of constitutional questions. *See* Pub.L. 100–204, § 901(a), 100 Stat. 1331, 1399–1400 (1987) (prohibiting Attorney General from excluding or deporting aliens or denying them a visa on the basis of any "beliefs, statements, or associations which, if engaged in by a United States citizen in the United States, would be protected under the Constitution"). Surely it cannot be suggested that the Attorney General is precluded from adding to subsection 235(c)'s vague specifications whatever he thinks is necessary to pass constitutional muster (assuming he concludes Rafeedie is entitled to constitutional protections). (The Immigration Act expressly permits the Attorney General to direct "such ... further inquiry" into the excludability of the alien subject to section 235 proceedings as he desires. *See* 8 U.S.C. § 1225(c) (1982).)

Nor can we assume that the INS would not consult with the Attorney General or others in the Justice Department with expertise in constitutional law. Thus, the majority's assumption that Rafeedie could not possibly expect any relief from the Regional Commissioner or anyone else in the Justice Department seems incorrect.

Assuming *arguendo* that we could properly conclude that the INS (supported by the Attorney General) would proceed "hell bent for election" to issue an exclusion order against Rafeedie under subsection 235(c) based on classified information which it would not permit Rafeedie to rebut, I fail to see why a habeas corpus proceeding is, in any fashion, an inadequate *judicial* procedure to challenge the constitutionality of that course of action. Rafeedie claims that if he were forced to submit to available administrative procedures (in particular, subsection 235(c) proceedings), his First Amendment rights would in the meantime be chilled, because he might ultimately be subject to an exclusion order entered under procedures which are unconstitutional as applied to him. Although my colleagues appear to accept this argument, I find it sheer gossamer. If, as Rafeedie claims, the INS's use of section 235 proceedings against him would violate his constitutional rights, any exclusion order arising out of that procedure would be overturned by the habeas corpus court. I do not see how we can assume otherwise, without denigrating the competence of the district court in which Rafeedie would be entitled to file his petition. And if that must be deemed to be so, Rafeedie's activities in the meantime (a very short meantime if the majority's expectation concerning INS's behavior is correct) could not be chilled, because he would have the certain knowledge that the administrative procedures could not hurt him.[14]

14. The concurrence's characterization of the § 235 proceeding pending against Rafeedie as a "sword of Damocles" is colorful but inapt. If one believes Rafeedie's allegations, *e.g.*, that the Regional Commissioner's eventual entry of an exclusion order is a foregone conclusion, the "sword of Damocles" the concurrence pictures

cannot chill Rafeedie's interim First Amendment activity, for the sword is sure to "drop" regardless of any such interim conduct. Moreover, if Rafeedie's claim of First Amendment chill stems in large measure from his allegation of the *facial* unconstitutionality of 8 U.S.C. § 1182(a)(28)(F) (*see supra* note 2), as I think it

The majority accepts another of Rafeedie's subtle arguments—one which I regard as a good deal more clever than real—that he would be obliged in a subsection 235(c) proceeding to volunteer information about his activities abroad without knowing the government's case against him; thus, even if he were able to prevail in subsequent habeas corpus proceedings and gain an order directing the INS to use section 236 instead, he would be deprived of a "substantial practical litigation advantage" in follow-on administrative proceedings. If he were to remain silent before the Regional Commissioner now, on the other hand, and later be unsuccessful in waging his claim of a constitutional entitlement to due process in a subsequent habeas proceeding, he might forever be barred from submitting a factual defense to his excludability. Under the circumstances, however, I believe Rafeedie can completely avoid the procedural problem he posits by remaining silent before the Regional Commissioner during section 235 proceedings. For I cannot imagine that a district court—one that had, on petition for writ of habeas corpus, held the government's use of subsection 235(c) unconstitutional—would fail to direct the INS, if it still wished to exclude Rafeedie, to start over with a plenary section 236 proceeding in which Rafeedie would enjoy all the litigating advantages he fears losing. Of course, if the government offered no more "process" and Rafeedie were to put on no defense before the Regional Commissioner and subsequently *lose* in habeas corpus on the constitutional issue, contrary to the majority's view, it is possible—though I still think highly unlikely—that Rafeedie would be foreclosed from making a factual defense in federal court. But in that event, the value of the opportunity Rafeedie would have foregone—the opportunity to "shadow box" the government's classified exclusion case before the Regional Commissioner—could not be regarded as substantial. The concurrence's position on this question, *see* concurrence *supra*, at 535 n. 9, reduces to the notion that if Rafeedie is destined to lose on his constitutional claim, he is entitled to an advisory opinion to that effect from this court prior to submitting to the administrative process. I do not agree. If the government's use of an unadorned section 235 proceeding against Rafeedie is constitutional, his "litigating strategy" in that proceeding is of little if any significance.

Finally, Rafeedie claims and the district court found (it is unclear exactly how the majority treats this argument, *see* Maj. op. *supra*, at 518) that Rafeedie would lose his liberty and right to work in the United States once an exclusion order under subsection 235(c) was entered against him. That would be true, however, only if for some miraculous and awful reason the district court in which he would be entitled to petition for habeas corpus were to disappear. The majority's discussion of the likelihood of parole, in that regard, seems beside the point. INS regulations oblige the service to allow an alien against whom an exclusion order is directed 72 hours to petition for habeas corpus, *see* 8 C.F.R. § 237.2 (1988), so Rafeedie would not, in my view, have any reason to fear even a brief detention.[15]

\* \* \* \* \* \*

Although Rafeedie may have sought a tactical litigating advantage in seeking an injunction barring the government from subjecting him to exclusion proceedings, his primary purpose, it seems to me, and

---

does, it seems immaterial whether Rafeedie is subject to summary or ordinary exclusion proceedings. Neither the Regional Commissioner in section 235 proceedings nor an Immigration Judge in section 236 proceedings has the authority to determine the facial constitutionality of the Immigration Act's provisions. Rafeedie's claim of incremental First Amendment chill, to that extent, is fictional.

**15.** Even were we to assume that Rafeedie would be detained briefly before a district court could order his release, that could not be thought to render habeas corpus "inadequate" as a constitutional matter.

certainly the primary effect of his action, was to shift the case from a district court in Cleveland, where Rafeedie lives and where he could seek habeas review of any exclusion order, to the District of Columbia.[16] That result was precisely what Congress wished to avoid when it passed section 106:

> Of special significance is the fact that habeas corpus actions are necessarily determined in the locality where the alien is, where he has been excluded, and where he is 'knocking at the door.' This prevents a process of 'shopping around' by an applicant for admission for a court in which he may seek to file repetitive declaratory judgment actions.

> In particular, no sound reason appears to the committee why excluded aliens arriving at the various ports in the United States should be permitted to burden an already overburdened court system in the District of Columbia by there instituting a declaratory judgment action against the Attorney General or the Commissioner of Immigration and Naturalization.

House Report at 33, U.S.Code Cong. & Admin.News 1961, p. 2977.

Of course, the INS did not detain Rafeedie at his port of re-entry; it paroled him into the country—as it apparently often does—pending his deferred inspection. But if an action such as that brought here can impair the INS's ability to conduct exclusion proceedings without interruption, it seems rather obvious that the INS will be obliged to be more careful of who it "paroles" into the country. The Supreme Court, when confronted thirty years ago with the argument that an alien's presence within the country's borders pursuant to parole should immunize him from exclusion proceedings, noted the obvious implications of accepting that argument:

> The acceptance of petitioner's position in this case, ... with its inherent suggestion of an altered parole status, would be quite likely to prompt some curtailment of current parole policy—an intention we are reluctant to impute to the Congress.

*Leng May Ma v. Barber*, 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246 (1958).

I believe that the District of Columbia district court lacked jurisdiction, and, therefore, I respectfully dissent.

---

**16.** The federal judicial district in which Rafeedie would be required to lodge his habeas petition upon detention is the district (or districts) in which personal jurisdiction could be asserted over Rafeedie's custodian or "jailer." *See Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 495, 93 S.Ct. 1123, 1129, 35 L.Ed.2d 443 (1973); *Chatman–Bey v. Thornburgh*, 864 F.2d 804, 813 (D.C.Cir.1988) (en banc). The question of who would constitute the alien's custodian in this setting has long since been settled. Because under the terms of the federal habeas statute "the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained," 28 U.S.C. § 2243 (1982), we have held "that the custodian is the person having a day-to-day control over the prisoner." *Guerra v. Meese*, 786 F.2d 414, 416 (D.C.Cir. 1986). And we have specifically rejected the argument that the Attorney General may properly be considered the custodian of federal prisoners by virtue of his supervision of the Federal Bureau of Prisons. *See Sanders v. Bennett*, 148 F.2d 19, 20 (D.C.Cir.1945); *cf. Demjanjuk v. Meese*, 784 F.2d 1114, 1116 (D.C.Cir.1986) (Bork, J., in chambers). Because 28 U.S.C. § 1391(e)'s provision for nationwide service of process— and thus nationwide personal jurisdiction—in a "civil action in which each defendant is an officer or employee of the United States" has been held not to apply in the habeas context, *see Schlanger v. Seamans*, 401 U.S. 487, 490 n. 4, 491, 91 S.Ct. 995, 997 n. 4, 998, 28 L.Ed.2d 251 (1971); *Chatman–Bey*, 864 F.2d at 813 n. 7, upon his detention (prior to deportation) Rafeedie would be permitted to file his habeas petition only in those courts having personal jurisdiction over the federal officer who holds the key to Rafeedie's cell.